W. Willard WIRTZ, Secretary of Labor,
United States Department of Labor,
Plaintiff,

v.

LOCAL UNION NO. 125, INTERNATION-
AL HOD CARRIERS' BUILDING AND
COMMON LABORERS' UNION OF
AMERICA, Defendant.

Civ. A. No. C 64-99.

United States District Court
N. D. Ohio, E. D.

April 1, 1966.

See also 375 F.2d 921.

John W. Douglas, Asst. Atty. Gen.,
Merle M. McCurdy, U. S. Atty., Harland
F. Leathers, Atty., Dept. of Justice,
Charles Donahue, James R. Beaird,
Washington, D. C., Aaron A. Caghan,
William Kloepfer, Ortha Barr, Jr., Nick
Spoke, Cleveland, Ohio, for plaintiff.

Mortimer Riemer, Cleveland, Ohio, for
defendant.

## MEMORANDUM OPINION

BATTISTI, District Judge.

On June 8, 1963, defendant held a
general election of officers. In this
election the vote for the office of Busi-
ness Representative resulted in a tie be-
tween two of the three candidates, those
two being Cecil Dial and Andrew E.
Jackson. On July 13, 1963, defendant
held a run-off election for the office of
Business Representative. In the run-
off election Andrew E. Jackson received
198 votes, Cecil Dial received 179 votes,
and Irwin Ferry received 2 votes.[1] Sub-
sequent to the July 13 election, Andrew
Jackson was sworn in as Business Rep-
resentative of the defendant.

On August 11, 1963, Cecil Dial, acting
pursuant to defendant's constitution,
protested the conduct of the run-off
election to the General Executive Board
of the International Hod Carriers' Build-
ing and Common Laborers' Union of
America. This protest was denied by
the General Executive Board on Decem-
ber 2, 1963. On December 9, 1963, Dial
filed a complaint with the Secretary of
Labor. Upon receipt of Dial's complaint
the Secretary investigated both the June

---

1. Mr. Ferry was the third candidate in the June 8 election.

8, 1963, general election and the July 13, 1963, run-off election.

On February 7, 1964, the Secretary filed the present action under the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C.A. §§ 401–531 (hereinafter referred to as the Act) seeking an order setting aside the June 8, 1963, general election and also the July 13, 1963, run-off election. In his complaint the Secretary alleged *inter alia* that the defendant had violated Section 401 of the Act (29 U.S.C.A. § 481) in that it had failed to conduct the two elections in accordance with its constitution and bylaws. The Secretary further alleged that these violations may have affected the outcome of the two elections.

In a memorandum opinion dated February 7, 1964, Chief Judge Connell granted the defendant's motion to dismiss that portion of the complaint directed to the general election of June 8, 1963. Wirtz v. Local No. 125, International Hod Carriers' Building and Common Laborers' Union of America, D.C., 231 F.Supp. 590 (1964). In dismissing that portion of the complaint, Judge Connell found that since no member of the defendant had complained internally about the conduct of the June 8 election, the Secretary's allegations with regard to said election were not, as required by Section 402 of the Act (29 U.S.C.A. § 482),[2] predicated upon a complaint by a union member who had exhausted his internal remedies.

The Secretary has now moved for summary judgment with regard to that portion of his complaint directed to the run-off election of July 13. In the al-ternative, the Secretary moves that the action be advanced on the trial docket.

As has already been noted, the Secretary alleges that defendant, in violation of Section 401(e) of the Act (29 U.S.C.A. § 481(e)), failed to conduct the July 13 election in accordance with the applicable provisions of its constitution and bylaws. Specifically, the Secretary alleges that the defendant (1) permitted ineligible candidates to run for office, and (2) permitted persons to vote who were ineligible to do so.

Section 401(e) of the Act (29 U.S.C.A. § 481(e)) provides in pertinent part as follows:

> (e) In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof. * * * Each member in good standing shall be entitled to one vote. * * * The election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this title.

It is clear, and the defendant does not urge otherwise, that the run-off election of July 13 comes within the purview of

---

**2.** Section 402 of the Act (29 U.S.C.A. § 482) provides in pertinent part as follows: (a) A member of a labor organization—(1) who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body, or (2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation, may file a complaint with the Secretary within one calendar month thereafter alleging the violation of any provision of Section 401 (including violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers). * * * (b) The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this title has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization. * * *

Section 401(e) of the Act. The alleged violations of Section 401(e) will be considered separately below.

### ALLOWING INELIGIBLE PERSONS TO VOTE IN THE JULY 13 ELECTION.[3]

Article VIII of Local 125's constitution provides in pertinent part as follows:

> "Section 5. The monthly dues are due on the first day of the month and unless paid on or before the last day of the following month, the member *shall be considered to be in arrears and suspended without notice.* (Emphasis supplied.)

> \*   \*   \*   \*   \*   \*

> "Section 7. The readmission fee for persons who are suspended for nonpayment of dues, assessments or fines to the Local Union and who remain suspended for a period of less than one year, shall be the amount of such assessments or fines in addition to the following: \* \* \* [figures omitted] \* \* \* Once the member has defaulted in the payment of dues, as herein provided, the date of suspension referred to in this section, shall be the first day after the month for which the member's dues were last paid.

> "Section 8. *Persons in arrears have no right to attend meetings nor any other rights except the right to be readmitted in accordance with the above section* [Section 7]. If a member becomes suspended by reason of his own conduct he can only be readmitted through the Local Union of which he was a member when suspended. Readmitted members shall be considered new members from the date of their readmission. (Emphasis supplied.)

It is on the basis of the above-quoted portions of Article VIII of the defendant's constitution that the Secretary predicates his claim that certain ineligi-

ble persons voted in the July 13 election. The Secretary urges that under the clear and unambiguous language of Article VIII a member who has not paid his dues within the time provided by Section 5 is automatically in arrears and should be suspended without notice. The Secretary further urges that once a member has fallen in arrears, he loses all rights except the right to be readmitted in accordance with Section 8 of defendant's constitution and, therefore, is not entitled to vote in union elections unless and until he has paid the mandatory readmission fee.

Article XVIII, § 3, of the International Constitution provides as follows:

> Section 3. Each Local Union shall, through its Secretary-Treasurer, pay to the International Union a per capita tax of $1.00 per member per month, payable for the current month on each member in the Local Union and an initiation fee of $5.00 for each member registered with the International Union as a member and $2.50 for each member readmitted; each initiation fee and each readmission fee must be accompanied with the per capita tax for the month in which the member is registered or readmitted.

It is clear from the defendant's answers to the plaintiff's interrogatories that defendant maintains "per capita tax sheets" reflecting payments made to the International pursuant to Article XVIII, § 3, of the International Constitution.

At the July 13 election, members listed as paid for the month of May, 1963 on the Secretary-Treasurer's per capita tax sheets were deemed to be in good standing and, thus, eligible to vote. (Admission 19.) These per capita tax sheets did not, however, accurately reflect the names of those persons who were actually in good standing as of July 13. (Admission 11.) Said sheets were inaccurate because the Secretary-Treasurer of the

---

3. It is clear that the portion of the Secretary's complaint directed to the matter of the eligibility of voters in the July 13 election is, as required by Section 402 of the Act (29 U.S.C.A. § 482), predicated upon a complaint by a member of the defendant who has exhausted his internal remedies.

defendant had paid the per capita tax for certain persons who were delinquent in the payment of their May, 1963 dues and also for certain persons who had either not paid or had not completed payment of mandatory readmission fees. Thus, of the 379 persons voting in the July 13 election, 58 were delinquent in their payments to the union. (See responses to plaintiff's request for admissions Nos. 20 and 21.) [4]

Mr. Martin M. Mason, Secretary-Treasurer of the defendant, has, by way of affidavit, stated as follows:

"The plaintiff also urges that many members for whom I paid their per capita tax were not eligible to vote. In the fall of 1962 and spring of 1963, there was a lot of unemployment in the Youngstown area. A lot of men who had been long-time members could not find work. They wanted to remain members and be eligible for any work that came along. They asked me for consideration as in the past to pay their per capita tax and keep their membership alive. This was not a practice I set up but was procedure that had been long established prior to my coming into office. I did this to help and assist these old time members. I explained this fully in my statement, plaintiff's exhibit "I". I think I should have an opportunity to explain this to the Court by testimony and not have this motion decided on these papers." (Defendant's exhibit 1.)

It might be noted that in plaintiff's exhibit I, the statement referred to in the above-quoted portion of Mr. Mason's affidavit, Mr. Mason stated in part as follows:

"I as Secretary-Treasurer of Local 125 have, on my own initiative, paid per capita tax to the International for members who have not paid dues to the Local. Many of these persons should have been automatically sus-

pended. I am also aware that these persons, delinquent over 61 days, should have been required to pay reinstatement fees to Local 125. According to our constitution, these members I have carried by paying their per capita tax who have not paid a reinstatement fee are not members in good standing and they should not have been permitted to vote in Local 125's election. The reason I carried some of these members by paying per capita tax to the International was so that they would work. Unemployment has been high in Youngstown, Ohio, and members don't have the money for dues. I paid their per capita out of the General Funds of the Local. However, many persons have been suspended by me for failure to pay dues. I only paid per capita for members I knew had been unemployed, had been long time members and I took into consideration personal hardships and family situations. I have kept no records of persons that I paid per capita for or who had not paid reinstatement fees."

Prior to the July 13 election it had been called to the attention of the International that the Secretary-Treasurers of certain locals were forwarding per-capita tax payments to the International for certain persons who were delinquent in payments to the local. On February 7, 1963, in a letter addressed to all affiliated local unions, district councils, and members, the General President and the Secretary-Treasurer of the International made the following comments with regard to this practice:

The General Executive Board, at a recent meeting, was made aware of several complaints and protests regarding payments of constitutional fees, such as dues, initiation fees, readmission fees, et al.

At the outset, it is to be observed that corresponding payments made by Local Unions to the General Secretary-Treas-

---

4. As to 13 of the 58, the facts giving rise to an obligation to pay a readmission fee are not readily apparent. See Admissions

21(d), (e), (k), (*l*), (u), (w), (z), (ak), (as), (ax), (ay), (az), (bg).

urer of the International Union, such as per capita tax, etc., are received and accepted on the presumption of propriety; namely, that the payments submitted are pursuant to and in accordance with the full intent of constitutional requirements. To illustrate: when the Secretary-Treasurer of a Local Union forwards per capita tax in behalf of a member, the presumption is that the Secretary-Treasurer has received payment of the dues for the particular month, directly from the member. It now appears that, in some instances, Secretaries-Treasurers of Local Unions forward per capita tax to the International Union for certain members who have not paid dues for the corresponding month.

The information further discloses that, in some instances, there has been a practice of so-called "free dues". This has occurred and has been applied to various officers of Local Unions, stewards on jobs, sick members, and for individuals in other categories or capacities.

It must be noted that such offer of per capita tax is definitely improper because it is not based on a payment made directly by the member to the Local Union, and, accordingly, any submission of per capita tax by the Secretary-Treasurer is therefore void, invalid and of no effect. You will also notice that, this being so, the member is not in good standing under the provisions of the Constitution.

In order that this entire area of mistaken and improper activity may be corrected, the General Executive Board, at its meeting held January 9–29, 1963, voted, that in all instances where and when the General Secretary-Treasurer, on and after April 1, 1963, finds that per capita tax and other fees submitted by Local Unions, are not based upon corresponding payments directly made by the member to the Local Union, such submission shall be deemed to be invalid, improper and of no effect.

It must be noted, as stated above, that where and when such finding occurs, the result is, that the members affected are not in good standing if the delinquency is for a period longer than that specified and provided for in the Constitution.

\* \* \* \* \* \*

All affiliates and members please take note and abide yourselves accordingly. (Plaintiff's exhibit C)

It is clear that the Secretary-Treasurer of the defendant failed to comply with International Union's directive of February 7, 1963. In fact, he acted directly contrary to the instructions contained therein. It is further clear that by using the Secretary-Treasurer's per-capita tax reports to determine voter eligibility for the July 13 election, 58 persons were permitted to vote notwithstanding the fact that they were delinquent in their payments to the defendant. (Admissions 20, 21.)

Were the 58 persons who were delinquent in their payments to the defendant union eligible to vote in the July 13 election? In answering this question, we must look to the constitution of the defendant union. In 87 C.J.S. Trade Unions § 13, p. 776, the following observations are made relative to the construction of union constitutions:

"Trade union constitutions should be read in their living context. The interpretation or construction of the constitution and laws of a union is for the union, through its appropriate board or officers; and the courts will accept such interpretation, as long as there is no claim of fraud, and as long as the officer or body on which this power of interpretation has been conferred does not substitute legislation or amendment for construction, does not transgress the bounds of reason, common sense, or fairness, or act arbitrarily, or contravene public policy or the law of the land, or destroy the property or contractual rights of, the members. Where the language of a rule is clear, no official may nullify it under the guise of interpretation."

As has already been noted, the Secretary urges that under the clear and unambiguous language of the defendant's constitution the 58 persons referred to above were ineligible to vote in the July 13 election.

Article VIII, § 5, of defendant's constitution clearly and explicitly provides that where a member fails to make a timely payment of dues he "shall be considered in arrears and suspended without notice." In answering plaintiff's interrogatories, defendant has indicated that a substantial number of its members have at one time or another been automatically suspended, pursuant to Article VIII, § 5, for non-payment of dues. Further, the International's directive of February 7, 1963, (quoted on pages 15, 16, supra) clearly indicates that a Local is obligated to suspend a member who fails to make a timely payment of his dues.[5]

■ The Court finds that under the clear and unambiguous language of Article VIII, § 5, members who fail to make a timely payment of their dues are automatically in arrears and should be suspended without notice.

■ Under the clear and unambiguous language of Article VIII, § 5, a member who has fallen in arrears has "no rights except the right to be readmitted in accordance with Article VIII, § 7." To be readmitted "in accordance with" Article VIII clearly requires that the member pay the established readmission fee. Thus, the Court finds that under defendant's constitution once a member has fallen in arrears and has thereby lost his rights, he may only regain the same by paying the established readmission fee. Moreover, there is no provision in the defendant's constitution which gives the Secretary-Treasurer of the Local the right to waive the required readmission fee.

As has previously been noted, 58 of the persons who voted in the July 13 election were either delinquent in the payment of their May, 1963 dues or had not paid or completed payment of mandatory readmission fees. The Court finds that these persons were not, under any reasonable construction of defendant's constitution, members in good standing and, therefore, were ineligible to vote in said election.

Defendant has urged that plaintiff's motion for summary judgment should be denied for the reason that there is an unresolved question of fact as to whether the practices followed by the defendant were reasonable. Defendant's position seems to be that even if it did not follow the eligibility standards of its constitution and bylaws, it must nonetheless be determined whether the standards actually followed were reasonable. This position lacks merit, for it seems clear that one of the basic purposes behind the election provisions of the Act was to require unions to comply with the provisions of their constitution and bylaws in the conduct of their elections. Where, as here, the conduct complained of cannot be justified under any reasonable construction of the union's constitution or bylaws, it would be most anomalous to hold that the conduct did not violate the Act because it was, in some abstract sense, "reasonable."[6]

5. Between May 1, 1962, and January 1, 1963, 357 members were so suspended; between January 1, 1963, and May 1, 1963, 229 were so suspended; between May 1, 1963, and June 8, 1963, 22 were so suspended; between June 8, 1963, and July 13, 1963, 73 were so suspended. (Defendant's answers to plaintiff's interrogatory No. 8.) The substantiality of these figures is readily apparent when viewed in relation to total membership figures. Defendant has indicated that it had 967 members on May 1, 1962, 730 on May 1, 1963, 717 on June 8, 1963, and 729 on July 13, 1963. (Defendant's answers to plaintiff's interrogatory No. 7.)

6. It is clear from Mr. Mason's affidavit that special consideration was given to only those delinquent members who Mr. Mason felt were deserving; and, further, that in granting such special consideration Mr. Mason was not acting pursuant to any authority granted to him by the defendant's constitution or bylaws. Further, Mr. Mason did not maintain records pertaining to his actions. If the

On January 27, 1966, the court heard oral arguments on the plaintiff's motion for summary judgment. On that date counsel for the defendant presented to the Court a copy of a directive of the International Union dated January 17, 1966, and addressed to all local unions, district councils and members. The directive reads as follows:

*"RE: Right to Vote"*

"Dear Sirs and Brothers:

"The General Executive Board, at its November 29—December 10, 1965 meeting was made aware of a grave danger to our membership, which has developed as a result of a *misinterpretation* of the Uniform Local Union Constitution and Release #1 of 1963, and which is threatening to deprive many members of long standing of their rights and benefits under the Union's Constitution and collective bargaining agreements, particularly the right, otherwise available, under the Union's Constitution to vote in the Union's general election for the candidate of their choice.

"The General Executive Board was presented with the issue of whether or not members in good standing *on the day of election* must be deprived of their right to *vote on election day* because at one time or another during the course of their membership, dues which they offered late were accepted by the Local Union, and the Local Union remitted per capita tax within the Constitutional period to the International Union, as a result of which the member's good standing was not, in fact, interrupted.

"The General Executive Board, for years, knew of a long-standing practice in many Local Unions where per capita tax payments were being improperly forwarded to the International Union by Local Unions. Release #1 of 1963 was directed principally to-

ward advising Secretary-Treasurers of Local Unions on the proper conduct of their office, the payment of dues and the persons on whose behalf per capita tax should be forwarded to the International Union.

"However, nothing contained in Release #1 nor in the Union's Constitution, stated in terms or inferred, that such a member whose good standing was not interrupted should be deprived of his legal and Constitutional right, otherwise available, to vote when he approached the polling place on election day. Nor was this, in fact, the intent of the General Executive Board in issuing Release #1, nor of the drafters of the Uniform Local Union Constitution.

"Indeed, to the contrary, the Board had consistently maintained the position throughout the years, that its Constitution must be interpreted as a *living document* in the light of the Union's history and tradition—giving due regard to its unique and real needs—not from a formalistic standpoint. It was never the intention of the Union in adopting its Constitution, or of the General Executive Board in issuing Release #1 or in otherwise interpreting its Constitution to *deprive members* of their right to vote. The Board had always interpreted its Constitution liberally to preserve the right of members to vote. Particularly, in dealing with problems in the election area, the Board had always placed substantial requirements over form. The Board will continue to adhere to this view.

"The Board was troubled by the misinterpretation of the Constitution and Release #1, which threatens to deprive wholesale numbers of members of their right to vote under the Union's Constitution and the Act. First, it felt that such an interpretation was unduly

Court was required to view the conduct complained of herein in the abstract, it would be forced to conclude, on the basis of the affidavits, admission and answers

to plaintiff's interrogatories, that said conduct was, as a matter of law, unreasonable.

infringing upon the prerogative of the Board to interpret its Constitution in a fair and responsible manner in the interest of the membership, and was seeking to substitute the judgment of persons outside the Union on the meaning of the Union's Constitution for that of the Union's governing body, which had been elected by the membership and charged with that responsibility.

"But in the Board's view, the principal vice of this hypertechnical interpretation was that it completely ignored the unique, real problems confronting the Union and its membership.

"The Board in interpreting its Constitution, is charged with the responsibility of giving due regard to the unique problems confronting the membership.

"In issuing Release #1, it was attempting to instruct its Locals on solid financial practices to promote their long run interests. The Board adheres to that view and is in no way attempting to relieve Secretary-Treasurers from their obligations. The Board knew then and it knows now that if its Constitution was construed to disenfranchise such members, a very substantial percentage of the total membership would be deprived of their right to vote. It knew then and it knows now that if such a harsh interpretation was placed upon the Union's Constitution, it would result in depriving many tens of thousands of their members and their families of death benefits built up over the years and of pension rights under collective bargained pension plans throughout this country. Moreover, it knows that if the Union were to adopt the interpretation urged, it could only suspend those members which would simply mean that they would lose their benefits, accruing over the years and be required to pay a new initiation fee under the Union's Constitution as a new member. The Board flatly rejected the opportunity for the International Union collect-

ing such a financial windfall and it instructed the Executive Officers to advise each affiliate of the following action and take whatever possible actions are necessary to defend the right of the membership to act in that regard.

"After due consideration, the Board " 'VOTED: In accordance with the power and authority vested in it by the International Union Constitution, Uniform Local Union Constitution, and Uniform District Council Constitution, that its Constitutional provisions shall not be interpreted to deprive members of their legal and constitutional right to vote in those instances where local unions have accepted dues late and remitted per capita tax within the Constitutional period to this International Union, so that the local unions were never notified by the International Union that such members were suspended. To the extent that anything contained in Release #1 of 1963 can be construed to reach a contrary conclusion or to cast doubt upon this position, it is hereby modified to that extent nunc pro tunc.'

"All affiliates and members please take note and abide yourselves accordingly.

Respectfully and fraternally yours,

/s/ Jos. V. Moreschi

/s/ Peter Fosco"

Presented to the Court, along with the above-quoted directive, was an affidavit of Robert J. Connerton, General Counsel of the International. In his affidavit Mr. Connerton states that the directive of January 17 is "a formal constitutional interpretation by the General Executive Board binding on all Local Unions and officers."

While the directive of January 17 may reflect an official action taken by the General Executive Board, the directions contained therein are ambiguous, inconsistent with the clear and unambiguous language of the Uniform Local Union Constitution, and, further, are in many respects inconsistent with the instructions given in the directive of February

7, 1963. As has previously been noted, the defendant clearly acted in violation of its constitution in allowing certain delinquent persons to vote in the July 13 election. The Court finds that the directive of January 17 does not, and cannot, exculpate the defendant from the consequences of its previously improper conduct.[7]

■ Defendant urges that, even if it is found that the defendant violated its constitution in the conduct of the July 13 election, plaintiff's motion for summary judgment must nonetheless be overruled for the reason that there is an unresolved question of fact as to whether the improper conduct "may have affected the outcome of the election" within the meaning of Section 402(c) (2) of the Act. Defendant states that even if certain ineligible voters voted in the July 13 election it is not clear which candidate they voted for. Defendant's position seems to be that where ineligible votes have been cast it must be shown not only that it is mathematically possible that the outcome of the election was affected, but, also, that the manner in which the ineligible voters voted actually did affect the outcome of the election. Defendant evidently has failed to recognize, however, that Section 401(d) of the Act required that the election in question be held by secret ballot. To require or allow inquiry into the manner in which certain persons have voted would be entirely inconsistent with the Act's requirement that the ballot be secret. The Court, therefore, finds that the Act's secret ballot requirement forecloses any inquiry into how particular persons voted. The Court further finds that if the number of ineligible votes cast is sufficient to make it mathematically possible that the outcome of the election was affected, this fact alone conclusively establishes the Act's requirement that the conduct complained of may have affected the outcome of the election.

As has previously been noted, the July 13 election was decided by 19 votes. In said election, 58 ineligible votes were cast. In light of what has been stated above, it is clear that the casting of these votes may have affected the outcome of the election.[8]

The Court finds that, with regard to the portion of the complaint here under consideration, there remains no genuine issue as to any material fact. The Court further finds that the defendant, in the conduct of the July 13 election, violated Section 401(e) of the Act, and that such violation may have affected the outcome of said election. Plaintiff's motion for summary judgment will, therefore, be granted.

## ELIGIBILITY OF CANDIDATES

Defendant's constitution requires candidates for office to have maintained continuous good standing in the International for a period of two years and continuous good standing in the Local for a period of one year (Article V, § 1). Prior to the June 8 election, the defendant's Election Committee considered the matter of the eligibility of candidates. In determining eligibility, the Committee referred to the Secretary-Treasurer's per-capita tax reports and the membership book of each potential candidate. (Admission 12) As has previously been noted, the per-capita tax reports did not give an accurate indication of whether individual members were in good standing at the date of the nominations or election, and, further, did not accurately indicate whether members had been in good standing in the defendant union for

---

7. The Court is in no manner indicating what steps the International or the Local can now reasonably take to resolve any problems which might result from such previous misconduct. Further, the Court should point out that this opinion is limited strictly to a determination of whether certain persons had a *right to vote* in the July 13 election.

8. As has previously been noted, the 58 voters involved either (1) had not paid their May, 1963 dues as of July 13, 1963, or (2) had not paid or completed payment of mandatory readmission fees. The number of persons within either category would, standing alone, have been sufficient to have affected the outcome of the election.

the year preceding the election or in the International for two years preceding the election. (Admission 11). The Election Committee did not examine the individual members' ledger cards, which cards would have accurately reflected the members' dues payments.

Within one year prior to the nominations and election, Andrew Jackson, the winner of the July 13 election, had been in arrears in his dues payments for more than two months. (Admission 18.) As has previously been noted, once a member falls in arrears he automatically loses his good standing. To regain good standing he must, under Article VIII of defendant's constitution, remit to the union the established readmission fee.

Under the circumstances set out above, it is clear that Mr. Jackson had not been in continuous good standing in the International for two years and, further, had not been in continuous good standing in the Local for at least one year. A similar situation prevailed with regard to Mr. Ferry. (Admission 16.) It is clear, however, that Mr. Dial had been in continuous good standing in the International for two years and, further, had been in continuous good standing in the Local for at least one year.

In protesting the conduct of the July 13 election, Mr. Dial made no claim relative to the eligibility of candidates. It would appear, therefore, that there is a substantial question as to whether, under the reasoning of Judge Connell's opinion, the Secretary is precluded from attacking the election of July 13 on this basis. Since, however, the Court has already found that the July 13 election must be set aside on the basis of the ineligibility of certain voters, neither this question nor the question of whether the election should be set aside on the basis of the ineligibility of candidates (assuming that the Secretary is not precluded from attacking the election on this basis) need be resolved.

An order will be entered in accordance with this memorandum opinion. Since the July 13, 1963, election concerned a single office, and, further, since the de-

fendant will obviously be holding a general election within several months, it is clear that many practical problems are presented with regard to the provisions to be contained in said order. The Court, therefore, requests that counsel meet within ten days and attempt to agree upon a final order which takes into account the practical problems involved. If the parties are able to agree upon an order, said order should be submitted to the Court on or before April 15, 1966. If the parties are unable to agree upon an order, the parties should inform the Court to this effect on or before the same date.