Carl **LATURNER** et al., Appellee,

v.

**BURLINGTON NORTHERN, INC.,** and Brotherhood of Locomotive Engineers, Appellants.

No. 72–1576.

United States Court of Appeals, Ninth Circuit.

July 17, 1974.

Rehearing Denied Aug. 21, 1974.

Woodrow L. Taylor (argued), Seattle, Wash., for Burlington.

Harold A. Ross (argued), Ross, Kraushaar & Bennett, Cleveland, Ohio, for Brotherhood of Locomotive Engineers.

William J. Powell (argued), Spokane, Wash., for appellees.

Before CHAMBERS and SNEED, Circuit Judges, and BURNS*, District Judge.

## OPINION

SNEED, Circuit Judge:

This appeal has as its genesis the 1970 merger of the Great Northern Rail-

---

* Honorable James B. Burns, United States District Judge, Western District of Oregon, sitting by designation.

way Company (GN), the Northern Pacific Railway Company (NP) and three of their operating subsidiaries—the Pacific Coast Railroad Company, the Chicago, Burlington & Quincy Railroad Company and the Spokane, Portland & Seattle Railroad Company (SP&S). It evolves from an action instituted by a group of dissatisfied employees who charged that the surviving carrier, Burlington Northern, Inc. (BN), and the Brotherhood of Locomotive Engineers (BLE), as the authorized bargaining representative for the craft of locomotive engineers, had discriminated against them for hostile and invidious purposes in the negotiation and implementation of an agreement which established, *inter alia*, the method for consolidating certain of the predecessor carriers' seniority rosters.

## FACTS

In early 1961, the above-mentioned rail carriers filed joint application with the Interstate Commerce Commission, I. C.C. Finance Docket Nos. 21478-80, for authority pursuant to Section 5(2) of the Interstate Commerce Act, 24 Stat. 380, as amended, 49 U.S.C. § 5(2), to merge the GN, NP, Pacific Coast and Burlington lines, and for the surviving carrier to lease the SP&S.[1] After extensive hearings on the application, and in

spite of a favorable recommendation by the hearing examiner, the Commission initially refused to approve the merger, 328 I.C.C. 460 (1966).[2] However, on January 4, 1967, the carriers' petition for reconsideration was granted, and shortly thereafter a second set of hearings were held. On November 30, 1967, the Commission reversed its earlier position and issued an order giving its authorization for the merger, 331 I.C.C. 228 (1967). There ensued numerous third-party requests for further reconsideration, and the Commission issued a series of orders, not pertinent here, in conjunction with those requests. In addition, several court actions were commenced in an attempt to overturn the agency's authorization. *See, e. g.*, United States v. United States, 296 F.Supp. 853 (D.D.C.1968). On March 3, 1970, the merger finally became effective by order of the Supreme Court. United States v. Interstate Commerce Commission, (Northern Lines Merger Cases), 396 U.S. 491, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970).

After the issuance of the hearing examiner's recommended report and order, but while the merger proposal was still pending before the Commission, the rail carriers entered into an agreement with the BLE to establish the job protections which would be accorded the union mem-

1. Section 5(2) of the Interstate Commerce Act establishes certain requirements which control the merger of common carriers. Under Section 5(2)(a), the consummation of a merger and its related transactions is prohibited without the prior approval of the Commission. Section 5(2)(b) provides, *inter alia* that, subject to such terms, conditions and/or modifications as it shall find to be just and reasonable, the Commission must determine that the merger is consistent with the public interest. Sections 5(2)(c)–(e) provide criteria for the Commission in making such a determination, and authority for it to require certain modifications of the merger proposal as a condition of its approval. Pursuant to Section 5(2)(f), *see infra* at n. 25, approval is also conditioned on the Commission's having insured a fair and equitable arrangement to protect the interests of the employees who are affected by the merger.

For an historical analysis of the merger proceedings in this case, and a discussion of certain allied transactions not directly relevant here, *see* United States v. Interstate Commerce Commission (Northern Lines Merger Cases), 396 U.S. 491, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970).

2. In the Commission's report denying the application, 328 I.C.C. 460 (1966), "it was found that the merger would result in a net loss of about 5,200 jobs on the applicant railroads, and that° through the so-called bumping process, the number of employees affected would exceed that number." 331 I.C.C. 239, 276 (1967). For a general discussion of the "bumping process," which refers to seniority displacements caused by a rearrangement or reduction in available work assignments, *see* Broth. Loc. Firemen & Eng. v. Southern Pacific Co. (T. & L. L.), 447 F. 2d 1127, 1129–1130 (5th Cir. 1971).

bership following the merger. This agreement, denominated the Merger Protective Agreement of June 29, 1965, guaranteed, *inter alia,* normal attrition and premerger wages for all locomotive engineers who had been employed on the predecessor lines. It also provided for subsequent negotiation by the carriers and the union of implementing agreements relating to the use of employees, rearrangement and changes in seniority districts, integration of seniority rosters in the consolidated seniority districts and other adjustments necessary to effect the merger.[3]

In January of 1966, the rail carriers and the BLE entered into a second agreement, known as Implementing Agreement No. 1, which contained, in pertinent part, certain provisions for the consolidation of seniority districts throughout the merged railroad system. The Implementing Agreement established five consolidated seniority districts. At issue in this case is the newly-formed Pacific Seniority District.[4] It

also provided that the consolidated seniority rosters for each of the five new districts were to be prepared on a percentage allocation basis—*viz.* on the basis of a ratio which contrasted the total engine hours and car miles within the newly consolidated district with the total engine hours and car miles in each of the former seniority districts so combined.

The Merger Protective Agreement and Implementing Agreement No. 1 were cancelled by the BLE, pursuant to their terms, following the Commission's initial decision to withhold its approval of the merger. However, in anticipation of receiving a more favorable ruling from the Commission on their petition for reconsideration, the carriers entered into a third agreement with the BLE on September 13, 1966. Under this third agreement, the two prior agreements were reinstated with several amendments, only one of which has particular relevance here.[5] As amended, the September 13, 1966 Agreement expressly

3. The Merger Protective Agreement provided, in pertinent part, for the preservation of employment and guaranteed monthly earnings based on test period earnings; for limitations on the obligation of an employee to take a position requiring a change in residence, without loss of earnings guarantees; and for increased moving expenses and other monetary benefits for an involuntary change in work location. In addition, all protected employees were automatically certified as being adversely affected by the merger without the necessity of having to prove direct adversity. The monthly monetary guarantee was to be automatically adjusted upward to compensate for general wage increases, and was to be independent of any outside earnings. Because the guarantee was based on a formula of average monthly earnings and average monthly hours worked, it would thus be possible for an employee to receive compensatory payments even though his actual wages exceeded the amount of his guarantee.

4. Prior to the merger, the individual predecessor lines had been divided into a number of operating divisions, each of which had a separate seniority roster for its employees. In conjunction with the merger, the BN was divided into five new seniority districts—Lake Superior District, Minnesota District, Montana District, Rocky Mountain District,

and Pacific District—only the latter of which we are concerned with here.

The Pacific Seniority District, which extends from terminals at Troy, Montana and Paradise, Montana on the East to the Pacific Ocean in Washington and Oregon on the West, involved the merging of seven former seniority rosters:

(1) Great Northern Spokane Tenth Division (home terminal, Spokane) 174 men;
(2) Great Northern Eleventh Division (home terminal, Seattle) 189 men;
(3) Northern Pacific Tacoma East Division (home terminal, Auburn) 130 men;
(4) Northern Pacific Tacoma West Division (home terminal, Tacoma) 80 men;
(5) Northern Pacific Idaho East Division (home terminal, Spokane) 108 men;
(6) Northern Pacific Idaho West Division (home terminal, Pasco) 114 men;
(7) Spokane, Portland & Seattle System (various terminals) 188 men.

5. The pertinent amendment to Implementing Agreement No. 1 reads in full as follows:

Section 3 of Attachment B of Implementing Agreement No. 1 is amended to provide that in the event the interested General Committees agree on a different arrangement for an equitable consolidation of rosters for any of the new districts as outlined therein, and the New Company

provided that the interested General Committees of the BLE could agree to reject a percentage block allocation and establish a different method for consolidating the seniority rosters in their respective districts.[6] Absent objection by the various carriers, the method so chosen would then be incorporated into the post-merger collective bargaining agreement executed by BN and the BLE.

During the interval in which the BN merger was temporarily inactive—between the initially adverse decision of the Commission and the execution of the September 13, 1966 Agreement—the delegates to the BLE convention had convened and extensively revised, effective July 19, 1966, that portion of the BLE Constitution which dealt with mergers and other related transactions.[7] In conjunction with certain of these changes, the Grand Chief Engineer of the BLE assigned one of the union's officers to coordinate the intra-union activities associated with the proposed BN merger. Among his duties, the officer was to assist the General and Local Chairmen in reaching a decision, pursuant to Standing Rule 35 and the September 13, 1966 Agreement, as to the method by which seniority rosters would be consolidated in the newly-formed districts.

In August of 1967, following numerous meetings among all interested parties, four proposals were offered to the Local Chairmen[8] for their consideration; and, after further debate, a fifth and sixth proposal were added.[9] On October 17, 1968, the General Chairmen of the NP, GN and SP&S sent a joint letter to

[BN] has no objection to such arrangement, then agreement will be entered into to cover such consolidation of rosters.

6. Prior to the BN merger, each of the predecessor lines had a local organization of the BLE which generally, but not always, coincided with the operating divisions of the various railroads. Each such organization elected a Local Adjustment Committee, headed by a Local Chairman whose duties were primarily the negotiation of local matters with the carrier involved. The Local Committees then elected a General Committee of Adjustment represented by a General Chairman who was responsible for negotiating system-wide matters with the carrier.

7. In addition to granting the Grand Chief Engineer considerable authority in the arrangements required by mergers, including a requirement that he "immediately assign an officer for the purpose of directing the committees in the handling to the best interests of the members involved [sic]," Section 35(a)(I)(D) of the Standing Rules was amended to read in full as follows:

   D. Seniority Districts

   Should it be, in the judgment of the officer assigned and the General Chairmen in the best interest of the members affected as a result of a merger, etc., to consolidate and/or merge a Seniority District or Districts, the General Chairmen shall consult with the Local Chairmen to work out a merger of the Districts and seniority rosters which shall be made on an equitable basis, as follows:

   In the preparation of seniority rosters to cover the Seniority Districts on an equitable basis, the General Chairman shall request the carrier to furnish promptly to him all statistical information such as, but not limited to, number of trains, car miles, train miles, and yard engine hours and/or inbound car count for use in determining a proper ratio to govern the parties.

   Should the General Chairman and affected Local Chairmen fail to agree, the matter shall be referred to the Grand Chief Engineer who shall make an investigation within thirty (30) days after which the Executive Committee of the G.I.D. [Grand International Division] shall make a determination which shall be final and binding.

8. In what was to become the Pacific Seniority District, there were seven local divisions of the three carriers involved. *See supra* at n. 4. These seven divisions were in turn represented by ten Local Chairmen—two GN Divisions represented by two Local Chairmen, four NP Divisions represented by five Local Chairmen, and one SP&S Division represented by three Local Chairmen.

9. Although there appears to be some confusion as to the exact nature of the initial proposals—the district court characterizing them as a percentage block plan, a date of hire with a prior rights plan and a plan that included matching engineers according to their seniority ranking on the former rosters—and no express findings were made as to the fifth and sixth proposals, for present purposes the only relevant distinction is between a percentage block allocation and a date of hire method, however modified.

the Local Chairmen requesting that each indicate his preference as to the consolidation method which would be adopted in his district. Additional meetings were held, and the BLE's Executive Committee was consulted on a number of occasions regarding the various proposals. When the process was finally completed, the Local Chairmen in the Pacific District had voted to recommend the implementation of a date of hire method in their district.[10] It was this recommendation which was ultimately incorporated into the BN-BLE postmerger collective bargaining agreement, dated February 19, 1970.

The present action, charging a violation of the Railway Labor Act, 45 U.S.C. § 151 et seq., and the Interstate Commerce Act, 49 U.S.C. § 1 et seq., was instituted by a group of locomotive engineers employed on the merged BN.[11] In their prayer for relief, the plaintiffs sought a declaratory judgment that the consolidated seniority roster for the Pacific District and the February 19, 1970 collective bargaining agreement between BN and the BLE were illegal, null and void. In addition, injunctive relief was requested to prohibit BN and the BLE from implementing the agreement and thereby utilizing a date of hire consolidated roster.

Following a trial on the merits, the district court held that the BN-BLE agreement of February 19, 1970, and in particular those provisions specifying that the seniority rosters in the Pacific Seniority District were to be consolidated using the engineers' date of hire, was contrary to the "clear and unambiguous" language of Standing Rule 35 of the BLE Constitution and therefore void. The court also held that by interpreting its constitution to permit a date of hire consolidation the BLE had breached its statutory duty of fair representation under the Railway Labor Act, thus rendering the agreement and resulting seniority roster illegal and unenforceable. Finally, it held that in implementing the agreement the union had placed the plaintiffs in a "worse position with regard to work opportunity" in violation of Section 5(2)(f) of the Interstate Commerce Act, 49 U.S.C. § 5(2)(f), the intent of the I.C.C. order approving the merger, 331 I.C.C. 228 (1967), and the Merger Protective Agreement and Implementing Agreement No. 1. A declaratory judgment was entered, and an injunction issued which prohibited BN and the BLE from giving effect to the February 19, 1970 agreement or utilizing a date of hire consolidated roster in the Pacific District. For the reasons which follow, we reverse with directions that the injunction be dissolved and judgment entered for the defendants.

## BREACH OF DUTY OF FAIR REPRESENTATION

■ Our analysis of whether the BLE has breached its statutory duty of fair representation under the Railway Labor Act, 45 U.S.C. § 151 et seq.[12] be-

---

10. Of the ten local chairmen, seven voted to recommend consolidation based on the engineer's date of hire as a fireman with a two-year restriction on the exercise of seniority rights unless, if a road engineer, the employee could not hold a similar job to that held prior to the merger, or, if a yard engineer, he could not hold an assignment in the same starting bracket. Two local chairmen voted to recommend that the rosters be merged on a percentage basis, the percent allocated to each former district determined by the number of men on its roster. Only one local chairman favored integration of rosters under a percentage block allocation method utilizing train miles and engine hours.

11. The action was initially brought by seven named plaintiffs, all formerly in the GN Spokane Tenth Division, who were subsequently joined by 161 engineers in the GN Eleventh Division and 45 engineers from the NP Idaho West Division.

12. The statutory duty of fair representation for bargaining representatives of railroad employees has been implied by the Supreme Court from Sections 1 and 2 of the Railway Labor Act, 45 U.S.C. §§ 151–152. See Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944).

gins, and in this instance ends, with our determination that the union's decision to implement a date of hire method for consolidating seniority rosters on the merged carriers was neither inequitable nor in violation of the "clear and unambiguous" language of the BLE Constitution.

Although the district court made no express findings on whether a date of hire consolidation was equitable under the facts of this case, we believe the record before us is more than adequate to support this conclusion.[13] It has long been recognized that the use of such a method to integrate seniority rosters is an equitable arrangement for resolving the inevitable conflicts which arise whenever a merger occurs. Humphrey v. Moore, 375 U.S. 335, 347, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964) and cases cited therein.[14] Provided that the use of this method was not foreclosed by Standing Rule 35 of the BLE Constitution, we thus view the implementation of a date of hire consolidation to be well within the "wide range of reasonableness [which] must be allowed a statutory bargaining representative in serving the unit it represents. . . ." *Id.* at 349, 84 S.Ct. at 372.

■ The pertinent portion of Standing Rule 35(a)(I)(D), which has been set forth in full in the margin,[15] reads as follows:

In the preparation of seniority rosters to cover the Seniority Districts *on an equitable basis*, the General Chairman shall request the carrier to furnish promptly to him *all statistical information such as, but not limited to*, number of trains, car miles, train miles, and yard engine hours and/or inbound car count *for use in determining a proper ratio to govern the parties*. (emphasis added).

In determining that the above-quoted language empowers the BLE to adopt a date of hire consolidation for integrating seniority rosters, we begin by recognizing the general proposition that:

Trade union constitutions should be read in their living context. The interpretation or construction of the constitution and laws of a union is for the union, through its appropriate board or officers; and the courts will accept such interpretation, as long as there is no claim of fraud, and as long as the officer or body on which this power of interpretation has been conferred does not substitute legislation or amendment for construction, does not transgress the bounds of reason, common sense, or fairness, or act arbitrarily, or contravene public policy or the law of the land, or destroy the property or contractual rights of, the members.

Wirtz v. Local Union No. 125, International Hod Carriers B. & C. L. U., 270 F. Supp. 12, 16 (N.D.Ohio 1966), *quoting from* 51 C.J.S. Labor Relations § 58, pp. 686–687. Thus, in the present context, the central issue which must be resolved is whether the Rule is sufficiently broad so that the officers of the BLE could properly construe it as allowing the Gen-

---

13. The various equities involved in the implementation of either a percentage block allocation or a date of hire consolidation have been extensively argued below and fully briefed by the parties to this appeal. Given that the record has fully developed this issue, we feel that a remand would serve no function but to further delay the resolution of a dispute which has remained too long unsettled.

14. In Humphrey, the Court held that a union's decision "to integrate lists upon the basis of length of service at either company [is] neither unique or arbitrary. On the contrary, it is a familiar and frequently eq-

uitable solution to the inevitably conflicting interests which arise in the wake of a merger. . . ." 375 U.S. at 347, 84 S.Ct. at 371. The Court also quoted with approval the following statement:

"Integration of seniority lists should ordinarily be accomplished on the basis of each employee's length of service with his original employer. . . ."

375 U.S. at 348, n. 10, 84 S.Ct. at 371, *quoting from* Kahn, Seniority Problems in Business Mergers, 8 Ind. & Lab.Rel.Rev. 361, 378 (1955).

15. *See supra* at n. 6.

eral Chairmen, once having considered the statistical information they receive from the carriers, to utilize a method of consolidation which yields an equitable result but which, in so doing, may either de-emphasize or entirely disregard certain of the expressly enumerated criteria.

Viewing the literal language of Standing Rule 35(a)(I)(D), we cannot say that it provides for an exclusive method of consolidation based upon a mandatory application of specific factors. As we see it, there are only two mandatory provisions in the Rule. First, there is the requirement that the General Chairmen, in determining the method which is to be implemented in a particular instance, must consider all relevant statistical data before rendering their decision. Second, there is the overriding requirement that the integration of seniority rosters must be accomplished in an equitable manner. Thus, under our construction of the Rule, the union has been given a wide range of flexibility which permits it to adopt a variety of different consolidation methods depending upon the varying situations with which it may be confronted and the peculiar interests of the employees who will be affected. In reaching its decisions, the union may emphasize certain criteria—such as date of hire—over others and it may also reject any of the data, whether it be expressly enumerated or not, provided that the consolidation method which is ultimately chosen proves to be an equitable one.

A review of the legislative history underlying the passage of Standing Rule 35 further bolsters our conclusion that the BLE was not "locked in" to a single method of consolidation. The discussion surrounding the adoption of the Rule does include statements which, if read in isolation, might indicate that some form of percentage block allocation was envisioned by the delegates to the BLE Convention.[16] However, these statements must be considered in the context of the entire floor debates.[17] When viewed as a whole, the legislative history clearly suggests that the primary purpose of the Rule was to give the union officers great flexibility in formulating methods to integrate seniority rosters; that no single method was intended to be prescribed; and that an employee's data of hire was one of the elements which was properly to be considered in determining which method would be equitable in any given case.[18]

---

16. For example, during the course of the proceedings Assistant Grand Chief Engineer Birrell stated that:

> . . . When you consolidate a roster in the mergers we are making today, you have to use the work that is available to that particular seniority district. In other words, *you take the mechanics here that are in this particular section, get all of your data from the railroad and the seniority rosters are then based on the work that is there.*
>
> *  *  *  *  *
>
> Now, in order to get guaranteed earnings and/or employment, you have to make certain changes, *and the only way you can consolidate a seniority roster with four or five railroads or ten railroads is by doing it on the basis of proration of work that was there on that particular track.* (emphasis added).

II Grand International Brotherhood of Locomotive Engineers First Quadrennial Convention Proceedings 1234–35 (1966) (hereinafter "Convention Proceedings").

17. For the entire floor debates surrounding the passage of Standing Rule 35(a)(I)(D), *see* Convention Proceedings at 1229–36.

18. Thus, the Chairman of the BLE's Constitution and By-Laws Committee, which submitted the resolution that was to become Standing Rule 35, stated in reference to a query concerning the enumerated criteria:

> Now, these are *some* of the factors. We say not limited to that. *There can be many other factors* that nobody would be able to foresee, at this minute, which would be confronting you. (emphasis added).

Convention Proceedings at 1231. And in response to the colloquy which ensued following Assistant Grand Chief Engineer Birrell's statement, quoted *supra* at n. 14, the Chairman stated that:

> . . . What we are talking about here is the consolidation of rosters, and in that

Nor does the precedent which deals with Standing Rule 35 undercut or in any way limit our belief that the Rule should be broadly construed. For example, in Price v. Seaboard Coastline Railroad Co., 332 F.Supp. 1093 (N.D.Ala., 1970), aff'd per curiam, 449 F.2d 1371 (5th Cir., 1971), a case in which, *inter alia*, the BLE was charged with having breached its duty of fair representation because of certain limitations imposed on the post-merger exercise of seniority rights, the agreement then before the court had provided for seniority dovetailing on two independent bases. Prior to the merger, one of the lines had maintained separate seniority rosters for its yard and road engineers. In order to consolidate these intra-line rosters, the agreement between the union and the surviving carrier provided for a modified date of hire dovetailing.[19] The resulting consolidated roster was then integrated with the seniority rosters in effect on each of the other merged carriers pursuant to a modified percentage block allocation formula utilizing four specific statistical elements.[20]

In its findings of fact, the district court first determined that:

As to each former seniority district, its equity in the work of the new consolidated seniority district was determined on the basis of its percentage of the total work performed in the former districts, as established by consideration of the four elements prescribed. Section 35 of the Standing Rules of the BLE Constitution, *which section sets forth the exclusive procedures governing the handling of merger related problems, including seniority, provides for the use of these four elements in determining the proper ratio for consolidating seniority rosters on an equitable basis in the event of merger.* (emphasis added).

332 F.Supp. at 1097. The court then went on to hold that there had been no breach by the union of its duty of fair representation, primarily on the ground that each engineer had been placed in "the same relative standing or position in regard to work opportunity as he was in prior to the merger."[21] Id. at 1097. *See also,* Cole v. Seaboard Coastline

consolidation of rosters I am told that the date *you hire on the railroad will count on these railroads when rosters are consolidated.* (emphasis added).
*Id.* at 1235.

19. This portion of the agreement provided that the two seniority rosters were to be consolidated on the basis of the individual's date of hire as a fireman, except where that date would "permit the individual to 'run around' an engineer having a higher existing rank on the engineer seniority roster." 332 F.Supp. at 1097.

20. The four elements which were used in the overall consolidation were: (1) Job starts of all engineers within each former seniority district; (2) Miles paid for, including engine hours for all engineers within each former seniority district; (3) Earnings for all engineers within each seniority district; and (4) Number of men on the January 1, 1966, and July 1, 1966, seniority rosters of each former seniority district. As outlined by the district court the consolidation was effected in the following manner:
In transferring the names from the former seniority rosters of engineers to the consolidated rosters on each of the six con-

solidated districts, each individual was inserted thereon in accordance with the positions delegated to his former district on the basis of its equity. As between the engineers as a group on the former district, each individual was placed thereon in relation to his relative position to the other engineers in the former district; that is, the individual's date of hire as a fireman was used except where said date would permit the individual to 'run around' an engineer having a higher existing rank on the engineers' seniority roster for his former district. In view of the percentage block formula, the date of hire as a fireman was not relevant as to the position on the consolidated roster between individuals from different seniority districts.
332 F.Supp. at 1097.

21. It was particularly interesting to note at this point in our analysis that, of the four elements used in the consolidation, only one was specifically enumerated in Standing Rule 35. In addition, the ratio which was implemented did not utilize all of the data which the Rule required the General Chairman to obtain.

Railroad Co., 65 C.C.H. Lab. Cases, ¶ 11,567 (E.D.Va.1970), aff'd, 64 C.C.H. Lab.Cases ¶ 11,499 (4th Cir, 1971)[22]

In Witherspoon v. Grand International Brotherhood of Locomotive Engineers, 260 S.C. 117, 194 S.E.2d 399 (1973) the Supreme Court of South Carolina dealt with another attack upon the same merger agreement which had been litigated in *Price.* The appellants in *Witherspoon,* however, contended that the agreement was invalid on the ground that the union could show no rational basis for its adoption of a percentage block allocation. They further contended that the only equitable method for consolidating the seniority rosters would have been one based solely upon the engineers' date of hire. In resolving the issue then before it, the court first noted that:

Section 35 of the standing rules of the BLE Constitution, which sets forth the procedures governing the handling of merger-related problems, including seniority, *contemplates elements other than date of hire in determining the method and proper ratio for consolidating seniority rosters on an equitable basis* in the event of merger. (emphasis added).

194 S.E.2d at 402. The court then went on to hold that:

The record fairly indicates that the BLE and Seaboard entered into the agreements with the good faith and honest belief that, considering all members, *dovetail percentage blocking was the most equitable method* to consolidate seniority rosters; and that the dovetail percentage blocking method *was one of a number of fair and reasonable methods available.* (emphasis added).

*Id.* at 403.

Contrary to the assertions of appellees, we do not read these opinions as establishing that Rule 35 mandates a percentage block allocation in the consolidation of seniority rosters. In both cases, the courts' overriding concern was with whether the method of consolidation actually implemented by the union had resulted in an equitable solution to what often proves to be an extremely difficult type of problem.[23] In each instance, the court resorted to the language of the Rule primarily as an aid in determining the central issue of whether the consolidation had been equitable; and in both the court was careful to avoid becoming enmeshed in the question of whether, and to what extent, the BLE was limited

22. In *Cole,* the district court was faced with another dispute arising from the agreement which had been before the court in *Price.* The two cases differed in the particular consolidated seniority district at issue, and in the absence of an initial date of hire consolidation on one of the lines. The only reference in the opinion to Standing Rule 35 was as follows:

As to each former seniority district, its equity in the work of the new consolidated seniority district was determined on the basis of its percentage of the total work performed in the former districts, as established by consideration of the four elements prescribed. Section 35 of the Standing Rules of the BLE Constitution *provides for the use of these four elements* in determining the proper ratio for consolidating seniority rosters on an equitable basis in the event of merger. (emphasis added).

65 C.C.H. Lab. Cases at 20,811.

23. The very multiplicity of conflicting contentions raised in *Price, Cole* and *Witherspoon* only highlights the virtual impossibility that any solution to the consolidation problem will be acceptable to all the parties affected. As has been noted by the Supreme Court:

Inevitably differences arise in the manner and degree to which the terms of any negotiated agreement affect individual employees and classes of employees. The mere existence of such differences does not make them invalid. The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion.

Ford Motor Co. v. Huffman, 345 U.S. 330, 338, 73 S.Ct. 681, 686, 97 L.Ed. 1048 (1953).

in the factors it could apply.[24] The references to Standing Rule 35 having been made in the context of demonstrating the equity of a particular method, we are not willing to accept the argument that these cases foreclosed other methods of consolidation which might have proven equally equitable but which were not as clearly within the express language of the Rule.

Having determined, contrary to the court below, that Standing Rule 35 does not require the BLE to utilize a percentage block allocation in consolidating its seniority rosters, we are thus not prepared to say that the union has breached its statutory duty of fair representation. *See, e.g.*, Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Humphrey v. Moore, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964); Ford Motor Company v. Huffman, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). While it may be that another method for consolidating the rosters at issue here would have satisfied a larger number of engineers affected by the merger, without more this Court should not substitute its views for those of officials elected by the employees to represent them in such matters.

## INTERSTATE COMMERCE ACT VIOLATION

In its conclusions of law, the district court held that:

> As a result of the Agreement dated February 19, 1970 (Joint Exhibit 7) and the resulting engineers' seniority roster . . . the plaintiffs have been placed in a worse position with regard to work opportunity . . . in violation of . . . Section 5(2)(f) . . . and of the intent of the I.C.C. order approving the merger, the Merger Protective Agreement *and Implementing Agreement No. 1* . . . . (emphasis added).

Although supported neither in its finding of fact nor by anything this Court has managed to glean from the record, the only possible ground for such a holding would be if the Commission considered the two above-mentioned agreements, but not the September 13, 1966 Agreement, in the discharge of its statutory duty under Section 5(2)(f) of the Interstate Commerce Act, 49 U.S.C. § 5(2)(f).[25] While logic and the record would both seem to indicate that such a construction of the facts may have been erroneous—*i. e. that the Commission*

---

24. For example, the court in *Witherspoon* expressly refused to rule on the issue of whether the BLE had violated Standing Rule 35 in implementing the consolidation. Having found that the consolidation was within the "wide range of reasonableness granted bargaining agents," 194 S.E.2d at 403, and thus not a breach of the union's duty of fair representation, the court went on to hold that even if a constitutional violation had occurred it would not have the effect of nullifying the collective bargaining agreement between the union and the merged carrier. 194 S.E.2d at 404.

25. Section 5(2)(f) of the Interstate Commerce Act, 49 U.S.C. § 5(2)(f), reads in full as follows:

> (f) As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provision of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees.

had before it either all three of the pre-merger agreements or solely the initial Merger Protective Agreement [26]—it is our view that even if the situation was as the district court seems implicitly to have held the plaintiffs below would be entitled to no relief under the Act.[27]

If either of the alternative factual contexts actually pertained, as the present record would lead us to believe, then the issue before us would·be capable of ready disposition and we would be forced to overrule the district court.[28] However, if the Commission did consider

26. Our examination of the record indicates that the only agreement actually before the Commission was the Merger Protective Agreement. For example, in its Report and Order the Commission referred to the *"agreement"* and noted as follows:

> The *agreement* recognizes the right of [BN] to transfer work throughout the merged system and *contemplates* the consolidation and extension of seniority rosters and seniority districts, on an equitable basis, pursuant to implementing agreements providing for the use of employees and the allocation and rearrangement of forces. (emphasis added).

331 I.C.C. at 278. The terms of the implementing agreements themselves are neither mentioned nor discussed during the course of the Commission's analysis of employee protections. *See* 331 I.C.C. at 276–79.

However, assuming that the Commission did consider the parties' subsequent agreements, it would seem highly improbable that it did not have the September 13, 1966 Agreement before it. The carriers' petition for reconsideration was not granted until January 4, 1967 and hearings did not commence until March of that year, 331 I.C.C. at 234. The Commission's order and report, which approved the merger, was not issued until November 30, 1967. In addition, at the time the petition was granted the Merger Protective Agreement and Implementing Agreement No. 1 had vitality only through, and to the extent not amended by, the later agreement. Thus, it would appear unlikely that the Commission would consider the first implementing agreement without also considering the second.

27. While normally our reaction in a situation such as this would be to remand the case for further findings of fact, we do not feel that such a course of action is necessary here. In our view, regardless of the circumstances which obtained, the plaintiffs would not be entitled to relief under Section 5(2)(f).

28. If the Commission considered solely the Merger Protective Agreement, then a date of hire consolidation would have violated neither the Act, the intent of the Commission's order, nor the Agreement itself. In addition to establishing wage and attrition guarantees, this agreement provided no more

than that seniority consolidation would be affected on an "equitable basis." As we have already held that the use of an employee's date of hire was an equitable method for integrating the seniority rosters in the Pacific District, the only issue would be whether the use of an equitable method could nevertheless violate Section 5(2)(f) by placing some employees in a "worse position with respect to their employment." Given the type of protections with which that Section is concerned, *see infra* at 606, we would find such an argument to be devoid of merit.

If the Commission considered both of the subsequent agreements, then there could similarly have been no violation·of the Act, the Commission's order, or Implementing Agreement No. 1. The September 13, 1966 Agreement did not require a specific method of consolidation but provided, contrary to the earlier agreement, that the union could adopt whatever method its General Chairmen should choose. In addition, the Commission's approval would have constituted a determination that both the percentage block and the machinery for implementing a different method were "fair and equitable." Thus the issue would again become whether the use of an equitable method, when coupled with wage and attrition guarantees, could be in violation of the "worse position" clause of Section 5(2)(f). As we have indicated, we would not accept such a contention.

In attempting to frame their argument on the issue of a violation of the Commission's order, appellees attempt to make much of the language requiring that:

> . . . no employee is to be deprived of his employment status or placed in a worse position with respect to compensation, rules governing working conditions, fringe benefits or rights and privileges pertaining thereto at any time during such employment.

331 I.C.C. at 277–78. They would have us read "employment status" as a requirement that every employee maintain the identical seniority rights as he had enjoyed prior to the merger. However, such a reading would necessarily require a "job freeze" and as a practical matter render *any* consolidation a violation of the Commission's intent. As we read the language, it refers merely to the status of being employed and the attrition

Implementing Agreement No. 1, but not the September 13, 1966 Agreement, then the issue becomes more complex. The union's integration of seniority rosters based on employee's date of hire would not have directly violated the intent of the Commissioner's order—the consolidation being equitable and the Commission not having expressly mandated that a particular method be used [29]—however it would violate the terms of Implementing Agreement No. 1. Thus, the issue before us would be the extent to which BN and the BLE will be bound by the terms of their pre-merger agreements where the Commission has reviewed those agreements prior to its approval of a merger. In particular, we must determine the extent to which a merged carrier and its employees' collective bargaining representative will be bound by those provisions in their premerger agreements which deal with matters not directly related to the compensation of discharged or displaced employees—here, the relative post-merger seniority rights of retained employees—in those situations where the Commission has adopted the agreements in discharge of its statutory duty under Section 5(2)(f).

For purposes of this analysis, the first case to clarify the scope and effect of Section 5(2)(f) was Railway Labor Executives' Assn. v. United States, 339 U.S. 142, 70 S.Ct. 530, 94 L.Ed. 721

(1950). In RLEA, the Court was confronted with the issue of whether the four-year period contained in the second sentence of Section 5(2)(f) had established a ceiling on the Commission's authority to require protections for employees affected by a consolidation or merger. In holding that the Commission's powers were not so limited, the Court began by examining the legislative history surrounding the enactment of the statute.[30] After a review of history from which the initial sentence of the Section evolved, Mr. Justice Burton first concluded that:

> If this provision, which later became the first sentence of § 5(2)(f), now stood alone as it did then, the Commission unquestionably would have the power to grant at least as much relief to employees as it had under § 5(4)(b).

339 U.S. at 150, 70 S.Ct. at 534.[31] He then went on to reject the argument that:

> . . . the second sentence of § 5(2)(f), which was inserted soon thereafter, amount[ed] not only to an additional provision for the protection of labor, but also to a limitation upon the discretion vested in the Commission by the first sentence.

*Id.*[32] In so doing, Mr. Justice Burton placed heavy reliance not only on the lit-

---

guarantees contained in the Merger Protective Agreement. Any broader reading would take such a requirement beyond the intendment of the Act. *See infra* at 606.

29. It is also arguable that use of a date of hire method could not have violated the intent of the Commission's order because at that time the Commission's view of the "notwithstanding" proviso of Section 5(2)(f) was such that the existence of the agreements removed the duty to provide *any* protection for employees covered by those agreements. 331 I.C.C. at 278. *See* Norfolk & Western Ry. Co. v. Nemitz, 404 U.S. 37, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971); Div. No. 14, Order of Railroad Tel. v. Leighty, 298 F.2d 17, 18 (4th Cir., 1962), cert. denied 369 U.S. 885, 82 S.Ct. 1160, 8 L.Ed.2d 287 (1962).

30. For a general synopsis of the legislative history of Section 5(2)(f), see the Appendix

to the Court's opinion in St. Joe Paper Co. v. Atlantic Coast Line R. R., 347 U.S. 298, 315, 74 S.Ct. 574, 98 L.Ed. 710 (1953).

31. Prior to the passage of the Transportation Act of 1940, which incorporated Section 5(2)(f) into the Interstate Commerce Act, there had been no statutory provision specifically requiring that protections be accorded employees adversely affected by railroad consolidations and mergers. The precurser of this provision, which is referred to in the Court's opinion, was Section 5(4)(b) which authorized the Commission to approve such transactions "upon the terms and conditions . . . found to be just and reasonable." 48 Stat. 217, *See generally* Railway Labor Executives' Assn. v. United States, *supra* at 146–148, 70 S.Ct. 530.

32. In its opinion, the Court expressly held: . . . that the time limit in the second sentence now applies to it and to it alone.

eral language of the statute, but also on an analysis of the introduction and subsequent modification of a legislative proposal known as the Harrington amendment.[33]

However, it was not until some eleven years later that the Court in Brotherhood of Maintenance of Way Employees v. United States, 366 U.S. 169, 81 S.Ct. 913, 6 L.Ed.2d 206 (1961) finally established the *type* of protections which were encompassed by Section 5(2)(f).[34] Squarely faced with the issue of whether monetary compensation for discharged or displaced employees satisfied the congressional mandate embodied in the Act, the Court rejected the contention that the Section contemplated a

"job freeze" for employees on the predecessor lines. As the Court saw it, Section 5(2)(f) was not concerned with maintaining employment status, *per se,* but rather with insuring that those employees affected by a merger would not be placed in a "worse position" with respect to their compensation for, at a minimum, the statutory four-year period.[35]

The final Supreme Court case which we must consider is Norfolk & Western Railroad Co. v. Nemitz, 404 U.S. 37, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971). In Nemitz the Court dealt with the validity of a post-consolidation collective bargaining agreement that had substantially abrogated certain compensation/attri-

---

As thus limited, that sentence adds a new guaranty of protection for the interests of employees, *without restricting the Commission's power to require greater protection as a part of a fair and equitable arrangement.* This serves the purpose of the sentence to increase, rather than to decrease, the protective effect of the paragraph. (emphasis added). 339 U.S. at 153–154, 70 S.Ct. at 536.

33. The Harrington amendment, which was to be incorporated into Section 5(2)(f) immediately following the first sentence, read in full:
    *Provided, however,* That no such transaction shall be approved by the Commission if such transaction will result in unemployment or displacement of employees of the carrier or carriers, or in the impairment of existing employment rights of said employees.
    84 Cong.Rec. 99,882 (1939). For a discussion of the introduction and subsequent rejection of this proviso which would clearly have required a "job freeze," *see* Railway Labor Executives' Assn. v. United States, *supra* at 150–153, 70 S.Ct. 530; Brotherhood of Maintenance of Way Employees v. United States, 366 U.S. 169, 174–177, 81 S.Ct. 913, 6 L.Ed.2d 206.

34. In distinguishing its prior opinion in RLEA, *supra,* the Court stated that:
    *The RLEA case was not concerned with the types of protection to be afforded employees* for the first four years following the merger; the only question was whether compensatory benefits could be extended beyond four years, and the Court held they could. (emphasis added).
    339 U.S. at 178–179, 81 S.Ct. at 918.

35. In reaching this result, Mr. Chief Justice Warren thoroughly reviewed the evolution of the Section, with particular emphasis on the Harrington amendment.
    First, it is clear that there were two alterations made in the substance of the original Harrington amendment: Not only was a four-year limitation imposed, but also general language of imprecise import was used in substitution for language clearly requiring 'job freeze' such as appeared in the original amendment and the 1933 Act. Secondly, the representatives whose floor statements are entitled to the greatest weight are those House members who had the last word on the bill—the House conferees who explained the final version of the statute to the House at large immediately prior to passage—rather than those Congressmen whose voices were heard in the early skirmishing but who did not participate in the final compromise. Finally, although it might be an overstatement to claim that their remarks are dispositive, the statements the House conferees gave in explanation of the final version *clearly reveal an understanding that compensation, not 'job freeze,' was contemplated.* (emphasis added).
    366 U.S. at 175–176, 81 S.Ct. at 916. He then went on to cite a series of contemporaneous interpretations of the Statute which supported the Court's holding. Thus, for example, the fact that the Commission had adopted an identical construction in its next annual report, I.C.C. 5th Ann.Rep. 60–61, and had subsequently imposed " . . . compensatory conditions, and only compensatory conditions, in proceedings involving § 5 transactions . . .", *Id.* at 177, 81 S.Ct. at 917, added great weight to the Court's view.

tion protections guaranteed employees under a prior agreement which had been adopted by the Commission in discharge of its Section 5(2)(f) duty.[36] The Court, in an opinion by Mr. Justice Douglas, refused to accept the argument that the final sentence of Section 5(2)(f)—the "notwithstanding" proviso—had relieved the Commission of *any* duty to review the adequacy of protective provisions contained in the post-consolidation collective bargaining agreement. As Mr. Justice Douglas analyzed the problem:

> We reviewed the history of § 5(2)(f) in Railway Executives' Assn. v. United States, 339 U.S. 142, 70 S. Ct. 530, 94 L.Ed. 721, and said that "one of its principal purposes was to provide mandatory protection for the interests of employees affected by railroad consolidations." *Id.*, at 148, 70 S.Ct. 530, at 533. That "mandatory protection" can be accorded by terms provided by the Commission, or, as is more likely, by provisions of a collective agreement which the Commission adopts or approves as adequate for a minimum of four years (as required by the second sentence) or longer (as allowed by the first sentence) if the Commission so

provides, Id., at 154, 70 S.Ct. 530 at 536. *The purpose of § 5(2)(f) was not to freeze jobs but to provide compensatory conditions.* Brotherhood of Maintenance of Way Employees v. United States, 366 U.S. 169, 175–176, 81 S.Ct. 913, 916–917, ᶜ L.Ed.2d 206. In that case, we noted that the Commission has consistently followed that practice "in over 80 cases, with the full support of the intervening brotherhoods." *Id.*, at 177, 81 S.Ct. 913, at 917. And the Commission over and over again has adopted the set of labor conditions contained in collective agreements in discharge of its duty under § 5(2)(f). *See* Gulf, M. & O. R. Co. Purchase, 261 L.C.C. 405, 434; Erie R. Co. Trackage Rights, 295 I.C.C. 303, 305; Delaware, L. & W. R. Co. Trackage Rights, 295 I.C.C. 743, 755–756.

> When there is a collective agreement and the Commission, as here, adopts or approves it, the "notwithstanding" sentence of § 5(2)(f) is not, as suggested, read out of the Act. *The collective agreement then becomes a "condition" of the Commission's "approval" of the consolidation under the first sentence of § 5(2)(f) and its provisions are deemed by the Commis-*

---

**36.** The facts surrounding the initial agreement in *Nemitz* were as follows:

> In anticipation of the 1964 consolidation, petitioner entered into an agreement with 19 labor organizations for protection of the employees of the several railroads coming into the consolidation. . . . Petitioner agreed to employ "all employees of the lines involved *with the guarantee that they will not be adversely affected in their employment* as a result of the proposed transactions or for any reason other than furloughs due to seasonal requirements or a decline in the volume of traffic or revenue." 324 I.C.C. 1, 89 (emphasis added).

> Each employee was to receive a monthly supplement to his post-consolidation monthly earnings equal to the excess, if any, of his average monthly compensation for the 12 months prior to the consolidation in which he had performed services. 404 U.S. at 39, 92 S.Ct. at 187. Later in the opinion, Mr. Justice Douglas described the

effect of the subsequent agreement on junior employees in the following terms:

> The 1965 agreement obviously placed these junior employees "in a worse position with respect to compensation," as those words are used in the pre-consolidation agreement. For they no longer could work on any part of the former Toledo Division except the Sandusky Line and their prior compensation, reflecting in part the work on other parts of the Toledo Division, was no longer a measure of the "compensation" to which they were entitled under the pre-consolidation agreement. For those whose historical average monthly earnings were so slight that they were now on unemployment insurance, the result would be much more drastic than "normal attrition," which the Commission said was the only way under the protective conditions by which jobs would be eliminated.

*Id.* at 44, 92 S.Ct. at 189.

*sion to be "a fair and equitable arrangement to protect the interests" of the employees within the meaning of the first sentence.* Thus, the significance of the "notwithstanding" proviso is that it provides the machinery for the terms of a pre-merger collective agreement and thus supplies the minimum measure of fairness required under the first sentence of § 5(2)(f). (emphasis added).

404 U.S. at 42–43, 92 S.Ct. at 188. He then went on to approve the holding of the Court of Appeals that:

> An agreement made pursuant to the last sentence of Sec. 5(2)(f) may vary the protections afforded by the I.C.C. order, but it *may not substantially abrogate employees' rights grounded in an I.C.C. order.* (emphasis added).

404 U.S. at 44, 92 S.Ct. at 189, *quoting from* 436 F.2d 841, at 848.

■■■ In the instant case, all locomotive engineers who would be affected by the BN merger were guaranteed normal attrition and pre-merger wage levels. Nor can it be argued that these protections have been abrogated by the BN–BLE post-merger collective bargaining agreement. Thus, the issue before us is whether the broad language of *Nemitz,* delineating the effect that Commission approval of pre-merger agreements will have upon subsequent collective bargaining, is to held applicable to all terms in the pre-merger agreement or, as was the case then before the Court, only to those terms dealing directly with compensatory protection for displaced or discharged employees.[37] It is our belief that the

language in *Nemitz* should properly be limited to the context which engendered it—*viz.* to those matters which have a direct bearing on insuring that employees who may be adversely affected as a result of a merger or consolidation are compensated in a "fair and equitable" manner. We thus hold that, even assuming the Commission had before it the Merger Protective Agreement and Implementing Agreement No. 1, but not the September 13, 1966 Agreement, those provisions in the Agreements which established the method for consolidating seniority rosters would not be binding upon the parties in their post-merger collective bargaining activities.

We reach this result on two interdependent grounds. First, because Section 5(2)(f) was designed " . . . not to freeze jobs but to provide compensatory conditions," Norfolk & Western Railroad Co. v. Nemitz, *supra* at 42, 92 S.Ct. at 188, the lifetime guarantees of wages and normal attrition given to employees in this case have provided the full measure of protection which that Section was meant to provide. Second, we feel that a contrary result would have the effect of severely emasculating the collective bargaining process both by eliminating the very flexibility upon which such bargaining depends and by interjecting the Interstate Commerce Commission and/or the courts into matters of substance which have historically been beyond their province, *see, e. g.,* Chicago & North Western Railroad Co. v. United Transportation Union, 402 U. S. 570, 579 n. 11, 91 S.Ct. 1731, 29 L. Ed.2d 187 (1971).[38]

---

37. We note at this point in our analysis that the Third Circuit has apparently adopted the position that when Section 5(2)(f) speaks of protecting the interests of "employees affected" it refers solely to those employees whose jobs are lost and/or whose relationship with the carrier is severed, rather than to all employees who suffer the possibility of displacement by reason of the transaction. *See* Clemens v. Central R. Co. of New Jersey, 264 F.Supp. 551, 565–568 (E.D.Pa. 1967) rev'd on other grounds 399 F.2d 825 (3d. Cir., 1968), cert. denied, 393 U.S. 1023,

89 S.Ct. 633, 21 L.Ed.2d 567 (1969). While we find the reasoning of the court in *Clemens* to be persuasive, given our holding in the instant case we deem it unnecessary to decide whether we would adopt such a position in the future.

38. For a general discussion of the ramifications which a broad reading of the Court's opinion in *Nemitz* might create, *see* Norfolk & Western Ry. Co. v. Nemitz, *supra,* 404 U.S. at 45–54, 92 S.Ct. 185 (Blackmun, J., dissenting).

We do, however, recognize the possibility that under certain circumstances provisions in a pre-merger agreement which do not speak directly to compensation may nevertheless be so intimately related to the compensatory protections guaranteed employees as to require their inclusion in a post-merger collective bargaining agreement. But this is not such a case. Here, there has been no abrogation of "the standard of 'compensation' covered by the [pre-merger] agreement which had come under the protective order of the Commission," Norfolk & Western Railroad Co. v. Nemitz, supra at 44–45, 92 S.Ct. at 189. Nor can an argument be made, given the lifetime guarantees accorded, that over the term of their employment the relative seniority rankings of retained employees will have any bearing on their ability to work at a level of compensation at least as great as that which they enjoyed prior to the merger.

The judgment below is, therefore, reversed.