**Paul J. BAKER et al., Plaintiffs,**

v.

**NEWSPAPER AND GRAPHIC COMMUNICATIONS UNION, LOCAL 6, et al., Defendants.**

**Civ. A. No. 77–2186.**

United States District Court,
District of Columbia,
Civil Division.

Oct. 24, 1978.

---

14.   *See, e. g., Crawford v. University of North Carolina*, 440 F.Supp. 1047 (M.D.N.C.1977).

Lawrence J. Sherman, Washington, D.C., for plaintiffs.

Zachary D. Fasman, Willis J. Goldsmith, Seyfarth, Shaw, Fairweather & Geraldson, Washington, D.C., for defendant Evening Star.

Neal P. Rutledge, Robert B. Cornell, Wald, Harkrader & Ross, Washington, D.C., for defendant International.

William N. Anspach, James R. Klimaski, Gaffney, Anspach, Schember, Klimaski & Marks, Washington, D.C., for Local 6.

## MEMORANDUM

OBERDORFER, District Judge.

### I. INTRODUCTION

Plaintiffs, pressmen employed by the Evening Star Newspaper Co. (the Star), are members of Local 6 (the Local) of the International Printing and Graphic Communications Union (the International). Plaintiffs bring this suit against the unions and the Star alleging violation of their federal rights to fair representation in collective bargaining based on 29 U.S.C. § 159(a), and to free speech and participation in connection with union business meetings, based on 29 U.S.C. § 411.

The dispute concerns the status of the plaintiff pressmen in relation to stereotypers employed by the Star, as that status was affected by an agreement bargained between the Local and the Star in 1976. That agreement provided, among other things, that the Star would close its separate stereotyping department and would

"dovetail" stereotypers and pressmen so that thereafter they would all be ranked in the pressroom for purposes of priorities by seniority, without distinction between stereotypers and pressmen. Plaintiffs claim that this agreement to dovetail stereotypers and pressmen violated rights guaranteed to pressmen by 1973 agreements which merged unions representing stereotypers into unions representing pressmen. According to plaintiffs these merger agreements and the permanent charters which implemented them required that whenever a publisher converted one method of printing into another method those journeymen working in the department being displaced would have an opportunity to be retrained and to enter the surviving department, but only on an "endtailed" status, i. e., senior to persons coming into the surviving department from the outside, but junior to the most junior journeymen at work in that department.

Plaintiffs claim that these union merger agreements required that all stereotypers displaced when the Star closed its stereotype department be relegated to the bottom of the pressroom priority list. If stereotypers had been so "endtailed" instead of being "dovetailed" as agreed to in 1976 by the Local and the Star, plaintiffs would enjoy a higher priority than they do now with respect to choice work assignments and job protection in the event of lay-offs.

The Court concluded earlier that it has jurisdiction over the plaintiffs' complaint and denied defendants' motions to dismiss it, based upon 29 U.S.C. §§ 301, 401. The case is now before the Court on defendants' motions for summary judgment and plaintiffs' motion for a partial one. On the basis of facts established by the parties' statements of material facts and genuine issues and by undisputed documentary evidence, the Court concludes that there was no actionable violation of the endtailing provisions of the union merger agreements and that there was, therefore, no violation of plaintiffs' right to fair representation. Nor is there any factual or legal basis for the plaintiffs' claim that their rights to free speech and participation under 29 U.S.C.

§ 411 were violated. The findings of fact and conclusions of law which lead to these decisions follow.

## II. Findings of Fact

1. In 1970 the Star obtained National Labor Relations Board approval of its decision to assign to the Photo Engravers Union some of the tasks theretofore performed by members of the then Stereotypers Union. *Washington, D.C. Stereotypers Union No. 19,* 181 NLRB 784 (1970). This NLRB approval was based in part upon the Star's representation that it would guarantee all stereotypers then in its employ an opportunity to work "until retirement or the occurrence of some other natural contingency" so that the reduction in force would be accomplished by "attrition." *Id.* at 787, 788, 789. The Star, through its Director of Industrial Relations, Harold Boyd, made a similar representation to David Barr, attorney for the Stereotypers Union (letter of April 25, 1969, ex. 1 to Defendant Star's Memorandum In Support of Its Motion for Summary Judgment.)

2. The 1973 agreement effecting the national merger of the Stereotypers' Union and the Pressmens' Union provided among other things that:

(a) "Where there is a loss of journeymen jobs because of a conversion (for example, letterpress to offset) the journeymen members within the plant who are displaced because of such conversion and willing to retrain will be given such an opportunity before new journeymen . . . are employed.

(b) The merger would not "affect, interfere with or change the continuing status or rights, duties and obligations [of either union] with respect to third parties [and would not] impair or otherwise affect . . . the rights and obligations of any local . . . under and pursuant to any collective bargaining agreement . . ."

3. The Constitution and Laws of the International formed by the merger provided that, among other things:

112

(a) Lay-offs would be effected by reverse seniority (last hired, first fired).

(b) "Priority shall be maintained in the operation of any sub-line and also in filling regular positions from such sub-line."

(c) "Local unions shall establish regulations permitting a·[priority] holder to engage in pursuits or gainful occupation other than that in which priority is held without loss of situation or priority, during which period the member exercising this privilege shall employ a substitute."

(d) Any individual local member may appeal any local decision adverse to him to the International. Appeals are taken successively to the President, to the Board and to the next International Convention.

4. The agreement merging the parallel local unions of stereotypers and pressmen provided that should journeymen lose jobs because of a conversion:

"the journeyman members displaced and willing to be retrained will be given the opportunity. They will go to the last flyman as of the date of the merger."

5. The collective bargaining agreement between Local 6 and the Star expired by its terms on September 30, 1975.

6. Negotiation of a new agreement began formally at about that time. Intensive bargaining began in early January 1973 and continued until an agreement was reached and confirmed in April of that year.

7. During all this time Local 6 has served as the exclusive collective bargaining agent for stereotypers and pressmen at the Star.*

8. Throughout the 1975–76 negotiating period, the Star was undergoing severe financial difficulties, with monthly deficits running as high as $1 million. (Boyd Stipulation at 3, 5, 8, 10; Lewis Deposition, ex. 1).

9. The Star was represented during the 1975–76 negotiations by new management which described the Star's financial condition to the union and plausibly suggested that the paper might soon be closed if labor cost savings could not be achieved. The negotiators related those representations to union members generally.

10. The Star proposed displacement of the stereotyping department and the dovetailing of its employees with pressmen in the pressroom. The closing of the department would reduce the Star's personnel costs. The dovetailing would honor the Star's obligation imposed by the 1970 National Labor Relations Board decision protecting the status of displaced stereotypers.

11. In responding to the dovetailing proposal, union negotiators did not refer to the "endtailing" provisions of the Local and International merger agreements.

12. ·Endtailing· of the stereotypers would have either severely limited the Star's ability to reduce pressroom personnel costs or would have violated the Star's representation to the National Labor Relations Board and to the Stereotypers Union.

13. Some pressmen who were members of the Local, apprised of the dovetailing proposal, vigorously protested to the union negotiators. The negotiators did not respond favorably to the protests. The Local President tore up a protestor's telegram.

14. The bargaining concluded on April 22, 1976, at which time the Star proposed, and the union negotiators accepted, subject to membership approval, a contract with a variety of provisions for personnel cost saving, including the displacement of the stereotyping department and the dovetailing of the stereotypers into the pressroom.

15. At a two-hour local union meeting about the proposed contract, the President discussed and answered members' questions about the provisions of the contract. The President recommended against the contract. The vote was on the contract as a whole. There was no vote on individual provisions; there was a separate vote on dovetailing. The membership voted 99 to 44 to approve the contract. The small number of stereotypers in the Union compared to the larger number of pressmen estab-

* See Plaintiffs' Statement on Material Facts as to Which There is No Genuine Issue, par. 2.

lished mathematically that the great majority of pressmen voted for the contract.

16. Local officials neither sought nor received International approval of the contract or the preceding negotiations.

17. Plaintiffs unsuccessfully protested within the Local its approval of the agreement with the Star. On June 6, 1976, plaintiffs appealed the Local's actions and decision to the International President and the International Board. They denied the appeal because, in the President's opinion, the International was not a party to the agreement and lacked power to restore plaintiffs' priorities. Plaintiffs took no appeal to the International Convention.

## III. Conclusions of Law

### A. Duty of Fair Representation Claim

1. The employee's right to sue for breach of a union's duty of fair representation developed as a necessary counterweight to the broad authority vested in unions to bargain on behalf of workers and to settle their individual grievances. *See Hines v. Anchor Motor Freight*, 424 U.S. 554, 563–67, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976). The subordination of the interest of individual employees carries with it a "responsibility and duty of fair representation," *Humphrey v. Moore*, 375 U.S. 335, 342, 84 S.Ct. 363, 368, 11 L.Ed.2d 370 (1964), which serve as a "bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Vaca v. Sipes*, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967). The indicium of a breach of this duty is conduct toward members of the "collective bargaining unit which is arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. at 916. Suits for breach of this duty have arisen in many different contexts. In one case involving seniority rights, one Court of Appeals held that where plaintiffs had made a showing that a minority of employees had been deprived of seniority rights, "for no apparent reason other than political expediency", the burden would shift to the union to show "objective justification for its conduct be-

yond that of placating the desires of the majority of the unit employees at the expense of the minority . . ." *Barton Brands, Ltd. v. N.L.R.B.*, 529 F.2d 793, 800 (7th Cir. 1976).

In the present posture of this case, plaintiffs have presented no evidence that the union's conduct was arbitrary, discriminatory or taken in bad faith. On the other hand, the record contains uncontested facts which establish that the settlement at issue here was neither arbitrary nor discriminatory action:

(a) The agreement was ratified by the pressmen, the class of which plaintiff is a member. After the Local negotiated the contract, including the dovetailing provision, the membership discussed it at a two-hour meeting and voted 2 to 1 to approve it. The membership voted for the provision despite the fact that the President of the Union recommended a negative vote on the proposal.

(b) The class of pressmen affected is not a helpless minority. At the time of the 1972–3 merger of pressmen and stereotypers and ever since, there have been ten times more Star pressmen than Star stereotypers in Local 6.

The following factors represent objective reasons for the union's acceptance of the settlement:

(c) The Star was under straitened economic circumstances and the parties were aware of those circumstances; those circumstances might have led to eliminating the jobs of pressmen and stereotypes alike.

(d) Given the Star's pledge to the stereotyper minority, unless the stereotypers could be dovetailed, no, or almost no, reduction of manpower and consequential cost savings could be effected.

The combination of ratification of the agreement by the pressmen, the existence of well-known, objective reasons for the union's acceptance of the agreement, and the absence of any evidence of discrimination make plaintiffs' case a difficult one. Nonetheless, plaintiffs argue that the union

breached contractual duties with its members when it entered negotiations and reached a settlement about seniority, and that this breach is also a violation of the union's duty of fair representation. This position of plaintiffs is no stronger than its generalized unfair representation claim.

2. Plaintiffs contend that the unions' merger agreements required that any stereotypers displaced must be endtailed in the pressroom. They invoke the simple and generally immutable principle that a contract is written to be performed. Any bargaining and any agreement reached contrary to duties under that contract were both arbitrary and unfair, they contend, and therefore violated the unions' duty of fair representation. The Court rejects plaintiffs' view both of the duties among the parties and of the consequences of the purported breach of the merger agreement.

(a) The merger agreements upon which plaintiffs' case depends do not exist in a vacuum. The contractual relations among the parties are shaped also by the NLRB decision to permit the Star to assign to the Photo Engravers Union some of the tasks previously performed by the Stereotypers Union, 181 NLRB 784 (1970). That decision, based in part upon representations to the Board by the Star that no stereotypers would be discharged, was made before the merger agreements were entered and it pre-empts and governs those latter agreements insofar as they affect the status of the Star stereotyper minority in the local. The Star's duty to that minority in any negotiations with the unions over priorities was further reinforced by the representations of Harold Boyd to David Barr, attorney for Stereotypers Local 19.

■ (b) More complete analysis requires consideration of national labor law which further affects the contractual duties among the parties. A fundamental policy of labor law is the encouragement of collective bargaining. Absent discrimination or unfairness which cannot be remedied through negotiation, freely-bargained solutions are to be preferred to those imposed upon the parties by the judicial system.

*Myers v. Gilman Paper Corp.*, 544 F.2d 837, 844 (5th Cir. 1977).

■ The significance of a clause purporting to fix a union's position with respect to seniority, then, must be evaluated in light of statutory duties to bargain collectively. Plaintiff cites a number of cases for the proposition that a union constitution and bylaws may restrict the bargaining range of union negotiators. The Court does not so read them. In *Laturner v. Burlington*, 501 F.2d 593 (9th Cir. 1974), the issue was whether the Brotherhood of Local Engineers (BLE)'s decision to implement a "date of hire" method for consolidating seniority rosters following a railroad merger constituted a breach of the duty of fair representation because it was inequitable and in violation of a provision of the union's constitution, (the "Rule"). By reviewing the seniority plan under the standards set forth in the constitution, the Ninth Circuit concluded that the plan was both equitable and within the latitude permitted by that constitution. It relied upon two other cases which gave a broad reading to the same union provision of the union constitution. *Price v. Seaboard Coast Railroad*, 332 F.Supp. 1093 (N.D.Ala.1970), *aff'd per curiam*, 449 F.2d 1371 (5th Cir. 1971); *Witherspoon v. Grand International Brotherhood of Locomotive Engineers*, 260 S.C. 117, 194 S.E.2d 399 (1973). In reviewing those cases, Judge Sneed noted their limited holdings:

In both cases, the courts' overriding concern was whether the method of consolidation actually implemented by the union had resulted in an equitable solution . . . In each instance, the court resorted to the language of the Rule primarily as an aid in determining the central issue of whether the consolidation had been equitable; and in both the court was careful to avoid becoming enmeshed in the question of whether, and to what extent, the BLE was limited in the factors it could apply.[24] . . . we are not willing to accept the argument that these cases foreclosed other methods of consolidation which might have proven equally equita-

ble but which were not as clearly within the express language of the Rule.

In footnote 24, he continued:

> For example, the court in *Witherspoon* expressly refused to rule on the issue of whether the BLE had violated the [Rule] in implementing the consolidation. Having found that the consolidation was within the "wide range of reasonableness granted bargaining agents", 194 S.E.2d at 403, and thus not a breach of the union's duty of fair representation, the court went on to hold that even if a constitutional violation had occurred it would not have the effect of nullifying the collective bargaining agreement between the union and the merged carrier. 194 S.E.2d at 404.

Thus in *Laturner* the Ninth Circuit consciously avoided the question whether the union constitution could in fact limit the union's actions in resolving the seniority issue.

Nor does *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964) give comfort to the plaintiffs. After a merger between two companies, a decision with respect to seniority was made by a joint committee purportedly pursuant to a collective bargaining agreement to which both predecessor unions had been parties. In contrast to our case, then, the parties had already bound themselves through the bargaining process. Although the Supreme Court specifically assumed, along with the lower court, that the agreement circumscribed the power of the joint committee, the specific relevant provision of the agreement required only a determination of seniority "by mutual agreement between the Employer and the Unions involved" and submission of the controversies to a grievance procedure. The Court concluded that the new provision for seniority was within the terms of the provision and thus did not represent a breach of the duty of fair representation. It specifically reserved a question akin to that here:

> "We need not consider the problem posed if [the provision] had been omitted from the [new] contract or if the parties had

acted to amend the provision. The fact is that they purported to proceed under the section."

■ The Court finds nothing in these or other cases supporting the right of a union to commit itself before bargaining to a fixed position with respect to seniority. To the contrary, seniority is a mandatory subject of collective bargaining. *NLRB v. Erie Resistor*, 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1973); *Oneita Knitting Mills v. NLRB*, 375 F.2d 385 (4th Cir. 1967); *Industrial Union of Marine & Shipbuilding Workers v. NLRB*, 320 F.2d 615 (3rd Cir. 1963). If the Local had refused to bargain with the Star about dovetailing as a solution to its financial problem, the Local's refusal might well have constituted a refusal to bargain in good faith, in violation of § 8(a)(5) of the Act, *NLRB v. General Electric Co.*, 418 F.2d 736 (2d Cir. 1969), *cert. denied*, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970); *NLRB v. Johnson*, 368 F.2d 549 (9th Cir. 1969).

(c) In light of the Court's finding of no other evidence of arbitrary, discriminatory or bad-faith action on the part of the union, plaintiffs, in order to present an actionable claim based on breach of the duty of fair representation, would have to argue that breach of the merger agreement was a per se violation of that duty. No authority supports that proposition. If a violation of a contractual duty occurred here, it was in fulfillment of a duty imposed by national labor law, and cannot, standing alone, form the basis for a breach of the duty of fair representation. Considering the dearth of evidence or legal precedent for finding such a breach, and the evidence—both of substantial economic motivation for the agreement and of ratification of the agreement by the union—which validates the settlement reached, the Court holds that defendants are entitled to judgment on this allegation as a matter of law.

■ The Court's reasoning and conclusion above are supported by *Burchfield v. United Steelworkers of America*, 577 F.2d 1018 (5th Cir. 1978) in which the Fifth Circuit affirmed a district court decision that a

modification of seniority rights did not constitute a breach of the duty of fair representation when agreed to in compliance with an obligation of the union and employer to provide equal opportunity in employment, even though the modification breached a current collective bargaining agreement, and even though the union had opposed efforts by its members to rescind the modification. Here negotiation about seniority was required both by labor law and by previous board action. And the agreement reached, like that in *Burchfield*, in no way constituted arbitrary discrimination against one group. Rather it represented a freely arrived at compromise reflecting both the legal and moral duties of the parties and the economic realities confronting them.

### B. Free Speech and Representation Claim

■ The undisputed facts about plaintiffs' free speech and participation claims based upon 29 U.S.C. § 411, against the union defendants similarly require a summary judgment. Local 6 members did, as plaintiffs allege, vote on the contract as a whole without having been afforded an opportunity to vote separately on the dovetailing provision or any other separate provisions of the Star proposal. But it is undisputed that the union negotiating committee discussed the separate provisions with the members for nearly two hours before it came to a vote. During this discussion the President answered questions about the particular contract provisions and even recommended against membership approval of the contract as a whole. Local membership nevertheless voted to approve the contract by a margin of 2 to 1. Plaintiffs cite no authority, nor has the Court discovered any authority, for their proposition that, in circumstances such as here, a union violates its members' statutory free speech and participation rights when it puts a whole contract to a vote, up or down, without permitting members to vote provision by provision. For these reasons the plaintiffs' claim on this free speech-participation issue will be rejected.

### C. Costs Claim

There remains one collateral issue which requires brief discussion:

■ The Star contends that plaintiffs' claim against it is so pointless that they should bear the costs incurred by the Star in defense of this action. The Court agrees with the Star that plaintiffs' claim should be dismissed on summary judgment because undisputed facts disclose it to be without merit. But there is a strong public interest in the ventilation of serious grievances through courts or other public forums, instead of, for example, by job action or a strike.

The plaintiffs are beneficiaries of agreements about their priorities which have not received the effect which plaintiffs probably believed in good faith those agreements were intended to have. Those priorities are valuable to the plaintiffs and their families. They are, therefore, to be commended and not condemned or penalized because they brought their grievance to court. Accordingly, the Star's prayer for assessment of attorneys' fees and costs against plaintiffs will be denied.

In all other respects, rejection of plaintiffs' claims against Local 6 disposes of the plaintiffs' dependent claims against the International and the Star. And it becomes unnecessary to consider whether the plaintiffs should be denied relief because they failed to carry their intra-union appeal to the International Union Convention. Compare *Chambers v. Local Union No. 639*, 578 F.2d 375 (D.C.Cir., 1978). An order will accompany this Memorandum granting defendants' motion for summary judgment, while denying plaintiffs' motion for partial summary judgment, as well as the Star's motion for taxation of cost and attorneys' fees to plaintiffs.