**Paul J. BAKER et al., Appellants,**

v.

**NEWSPAPER AND GRAPHIC COMMUNICATIONS UNION, LOCAL 6, et al.**

**No. 78–2332.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 26, 1979.

Decided April 28, 1980.

Lawrence J. Sherman, Washington, D. C., for appellants.

Zachary D. Fasman, Washington, D. C., with whom Willis J. Goldsmith, Washington, D. C., was on brief, for appellee, Evening Star Newspaper Co.

Neal P. Rutledge, Washington, D. C., with whom Robert B. Cornell, Washington, D. C., was on brief, for appellee, International Printing and Graphic Communications Union.

James R. Klimaski, Washington, D. C., with whom William N. Anspach and Katharyn M. Marks, Washington, D. C., were on brief, for appellee, Local 6, Newspaper and Graphic Communications Union.

Before LUMBARD *, Senior Circuit Judge, United States Court of Appeals for

---

the Second Circuit, and TAMM and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Five pressmen at the *Washington Star* were unhappy with the results of a collective bargaining agreement negotiated by their union with the newspaper. They brought this suit in the district court on a variety of claims against the newspaper company, the local union and the international union. The court below granted summary judgment for the defendants, concluding that there was no actionable contract violation, and no breach of federal labor law, either as to the unions' duty to render fair representation in collective bargaining or as to the plaintiffs' right to free speech and participation in union affairs. *Baker v. Newspaper & Graphic Communications Union, Local 6,* 461 F.Supp. 109 (D.D.C.1978). As to the Evening Star Newspaper Co. (Star), which publishes the *Washington Star* and employs these pressmen, we agree that there was no actionable claim. As to the unions, we are precluded from determining whether there were any contractual violations because the court's jurisdiction "must yield to the exclusive primary competence of the [National Labor Relations] Board." *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 245, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959). As for the plaintiffs' other claims against the unions, we affirm the judgment of the district court.

## I. BACKGROUND

Prior to 1973, Local 6 of the International Printing Pressmen and Assistants' Union of North America represented the pressmen at the Star, and Local 19 of the International Stereotypers', Electrotypers' and Platemakers' Union represented the stereotypers. The two international unions merged into the International Printing and Graphic Communications Union (hereinafter called

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

"International"). The two local unions, as a result of extensive negotiations, similarly consummated a merger agreement, pursuant to which the merged Local 6, affiliated with the International, would represent both the pressmen and the stereotypers at the Star.

The stereotypers, smaller of the two groups, had long been suffering the problems of automation and changing technology, and were something of an endangered species. As one of the conditions of the local merger agreement, the parties agreed that if the stereotype department was eliminated at the Star, the stereotypers would be able to retrain for available jobs in the pressroom before new personnel were hired. In return, the pressmen demanded and obtained a clause requiring that retrained stereotypers would be subject to "endtailing," as opposed to "dovetailing," for purposes of future layoffs and other work conditions. As the term implies, endtailing would put all of the stereotypers below any of the pressmen then employed with respect to seniority, thereby requiring that all stereotypers be laid off prior to any pressman. Dovetailing, on the other hand, would rank the stereotypers on the same roster as the pressmen: the seniority of each employee would be measured by his years of employment at the Star.

In 1975, at the time of collective bargaining negotiations with the merged Local 6, the Star was undergoing serious financial problems. One of the demands made by the Star was to close the stereotyping department and dovetail its employees with the pressmen in the pressroom. Underlying the Star's insistence on dovetailing, rather than endtailing, was its obligation to maintain an earlier pledge of lifetime employment to the stereotypers. *See Washington, D. C. Stereotypers Union 19*, 181 N.L.R.B. 784, 788 (1970). Because of that pledge, endtailing the stereotypers would have precluded any reduction of the pressroom force. Dovetailing, on the other hand, would allow the Star to discharge some of the pressmen and use instead the stereotypers who had been promised lifetime jobs. The expected savings in pressroom costs

became a major bargaining goal of the Star. The endtailing provision of the local merger agreement was not raised by the union at the bargaining table.

The Star's proposal was ultimately accepted by the bargaining team for Local 6 and was incorporated into what the parties called the "Survival Agreement." In April of 1976, the Survival Agreement was submitted to the entire membership of the merged Local 6 for ratification. The ratification meeting was lengthy and apparently lively. After the agreement was read, item by item, a question and answer period followed. The entire agreement was then put to a vote and ratified, 99 to 44.

Following Local 6's acceptance of the Survival Agreement, the Star dovetailed seven stereotypers into the seniority list of approximately 75 pressmen. The plaintiffs are some of the pressmen whose seniority was adversely affected by this result. After an unsuccessful appeal to the International, they brought this lawsuit.

## II. THE CONTRACT CLAIMS

Plaintiffs claim that the conduct of the defendants breached various contractual obligations owed to them. They contend that the commitment to endtail the stereotypers was contained not only in the merger agreement between the two local unions, but also in the post-merger International constitution and in the post-merger Local 6 constitution. The plaintiffs also complain of violations of pre-merger collective bargaining agreements between Local 6 and the Star. We turn first to the claims against the Star, which are the most attenuated, and then to the claims against the unions, which require more attention.

### A. *Claims Against the Star*

■ It is difficult to comprehend how the collective bargaining agreements covering the period prior to the merger may have been breached. The law is clear that any seniority rights founded on those agreements terminated upon the advent of the new agreement. "Seniority is wholly a cre-

ation of the collective agreement and does not exist apart from that agreement. The incidents of seniority can be freely altered or amended by modification of the collective agreement." *Local 1251, UAW v. Robertshaw Controls Co.,* 405 F.2d 29, 33 (2d Cir. 1968) (en banc); *accord, Ekas v. Carling Nat'l Breweries, Inc.,* 602 F.2d 664 (4th Cir. 1979), *cert. denied,* 444 U.S. 1017, 100 S.Ct. 669, 62 L.Ed.2d 646 (1980). Plaintiffs seek to convert their pre-existing seniority rights into a "shop practice" which would not be affected by subsequent changes in collective bargaining agreements. Whatever the indelibility of shop practices,[1] such a conversion is hardly possible when the collective bargaining agreements were the original source of the seniority rights. Plaintiffs cite *Houston Chronicle Publishing Co.,* 145 N.L.R.B. 1657 (1964), where the National Labor Relations Board (Labor Board) found that a union work rule had been recognized as binding by the employer and the union, apart from the collective bargaining agreement between them. The Labor Board accordingly rejected an employee's claim that enforcement of the union work rule by the employer was an unfair labor practice. No such fact situation exists here where both the Star and Local 6 deny that there was any "rule" regarding work priorities beyond the rights conferred by individual collective bargaining contracts.

■ In view of the plaintiffs' inability to support their naked allegation that the Star colluded with Local 6, *see* note 12 *infra,* and since the Star clearly lacked any fiduciary duty toward the plaintiffs in the course of collective bargaining, *cf. Harrison v. United Transportation Union,* 530 F.2d 558, 561 (4th Cir. 1975), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1739, 48 L.Ed.2d 203 (1976), there is no other basis for liability on the part of the Star.[2]

## B. *Preemption*

Plaintiffs insist they have a contractual claim arising under the local merger agreement and the union constitutions. Whatever the merit of the plaintiffs' position, we must conclude that a federal court is not the place to seek its vindication. At most the plaintiffs present a question which lies within the special province of the Labor Board.

In reviewing the undisputed facts, the plaintiffs appear to have stated at least a colorable breach-of-contract claim under local law. While they point to three different sources for their alleged contractual rights,[3] the pertinent language, reasonably

---

1. In an analogous case, *J. I. Case Co. v. NLRB,* 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944), the Supreme Court held that pre-existing individual employment contracts must yield to the terms of a collective agreement. The *J. I. Case* decision casts considerable doubt as to the validity of the plaintiffs' theory that a so-called shop practice automatically survives a subsequent collective bargaining agreement when the two are in conflict. Since a collective agreement prevails over actual, pre-existing employer-employee contracts, at least to the extent they are in conflict, then *a fortiori* it would appear to supersede shop practices under the same circumstances.

2. At oral argument, the Star renewed its claim that the plaintiffs should compensate the Star for the costs incurred by the Star in defending against this lawsuit. We do not believe that the district court abused its discretion in denying an award of costs to the Star. Fed.R.Civ.P. 54(d); *see* 10 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 2665, p. 123 (1973). There being no support for the Star's charge that the plaintiffs asserted claims against the Star in bad faith, recovery of attorney fees by the Star is not available. *See Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 1946, 36 L.Ed.2d 702 (1973).

3. The merger agreement between the local unions declared, *inter alia*:

> [W]here there is a loss of journeymen jobs because of a conversion, the journeymen members displaced and willing to be retrained will be given the opportunity. They shall go behind the last flyman as of the date of merger.

A "flyman" is an employee who performs general chores in the pressroom, as opposed to more specialized lithographers.

The post-merger International constitution provided, *inter alia*:

> Priority shall be maintained in the operation of any sub-line and also in filling regular positions from such sub-line.

In the printing trades, "priority" is the equivalent of "seniority." It determines the order of layoffs, vacation scheduling and other related matters. (J.A. 357) A "sub-line" is considered

common to all of the documents involved, is in the merger agreement between old Local 6 of the pressmen's union and Local 19 of the stereotypers. Under that agreement, endtailing of displaced personnel was stated as a condition of the merger. The agreement seems to have all of the elements necessary to constitute a contract between the parties. Both union memberships gave up some autonomy and rights, both relied on the covenants contained in the merger agreement, and, indeed, the defendant unions do not seriously contend the absence of a contract. The covenants undertaken in that agreement would appear to have been breached when Local 6 accepted the Survival Agreement which specifically provided for dovetailing the displaced stereotypers with the pressmen. Plaintiffs complain that this affected the essence of their job rights at the Star, relating as it does to the very continuance of their employment there.

The defendant unions argue that since the merger agreement also called for the merged organization to preserve jobs,[4] acceptance of the Survival Agreement with its dovetailing provision was a legitimate balancing of contractual obligations. It may be true that in 1976, given the Star's financial woes, the bargaining team faced the alternative consequences of dovetailing for some or unemployment for all.[5] Weighing the choice of which goal of the merger

agreement to defend, it can well be argued that preservation of the Star—the "corpus" as it were of the employment of the many—was a legitimate and overriding concern of the bargaining team. While such an argument attests to the good faith and motives of the bargainers, see part III infra, it does not necessarily resolve the question of whether they are liable for an alleged breach of contract.[6]

The crucial difficulty with the plaintiffs' position, however, is their choice of forum. The federal scheme of labor regulation proscribes our consideration of the claim because, under the preemption doctrine formulated in San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236 (1959), state and federal courts are precluded from encroaching upon the primary jurisdiction of the Labor Board. The Court held in Garmon that "[w]hen an activity is arguably subject to § 7 or § 8 of the [National Labor Relations] Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board . . . ." 359 U.S. at 245, 79 S.Ct. at 779–780. While the Garmon rule has undergone some refinement over its 20-year existence, it has retained its essential vitality. See Sears, Roebuck & Co. v. San Diego County Dist. of Carpenters, 436 U.S. 180, 98, 1745, 56 L.Ed.2d 209 (1978); Farmer v. United Carpenters & Joiners Local 25, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338

to be a department, in this instance the pressroom.

The post-merger Local 6 constitution provided, inter alia:

> Every member, by virtue of his membership in this local Union, is obligated to adhere to and follow the terms of the . . . International Constitution with respect to his rights, duties, privileges and immunities conferred by [it]. Each member shall faithfully carry out such duties and obligations and shall not interfere with the rights of fellow members.

4. The merger agreement between the local unions explicitly stated that "[i]t is the intention of the merged organization to preserve the jobs of its members."

5. Throughout the negotiations, the Star emphasized that the survival of the newspaper depended upon certain cost-saving proposals

made by the Star. At the opening of the negotiations, a letter from Joseph Albritton, then publisher of the Star, revealed that the Star's monthly losses were exceeding $1,000,000. Toward the end of the negotiations some months later, the Star pressed for acceptance of its proposals (including dovetailing the stereotypers with the pressmen), reiterating that the only alternative that the Star had was to "close [our] doors." (J.A. 231, 237) (brackets in original)

6. Defendants also contend that the ratification of the Survival Agreement by the membership of the new Local 6 vitiates the asserted breach of contract. Given the Labor Board's primary jurisdiction over the contractual claim, we express no views as to whether the ratification vote could modify or excuse the alleged contractual obligation owed by the defendants.

(1977). *See also Waggoner v. R. McGray, Inc.*, 607 F.2d 1229 (9th Cir. 1979).

In *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), an employee brought a breach-of-contract suit against his union. He claimed that his suspension from the union for failing to pay his dues violated the union's constitution and bylaws. The Idaho Supreme Court, recognizing the presence of an unfair labor practice, nevertheless asserted jurisdiction because resolution of the claim depended upon the proper construction of the union constitution and bylaws. In the state court's view, deciding the breach-of-contract claim did not invade the province of the Labor Board's powers. The Supreme Court reversed on the basis of the preemption doctrine, stating:

> The rationale for pre-emption . . . rests in large measure upon our determination that when it set down a federal labor policy Congress plainly meant to do more than simply to alter the then-prevailing substantive law. It sought as well to restructure fundamentally the processes for effectuating that policy, deliberately placing the responsibility for applying and developing this comprehensive legal system in the hands of an expert administrative body rather than the federalized judicial system.

*Id.* at 288, 91 S.Ct. at 1918 (footnote omitted). The Court made clear that "[i]t is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern." *Id.* at 292, 91 S.Ct. at 1920.

■■■ The instant case clearly falls within the preemption doctrine. The conduct which the plaintiffs assail is the union's acceptance of the dovetailing proposal in collective bargaining with the Star and the plaintiffs' consequent loss of seniority. Nothing could be more central to national labor policy than the conduct of parties in the course of collective bargaining. Absent the most compelling of circumstances,[7] the courts will not review the results of collective bargaining to determine whether a bargaining team should have accepted or rejected particular proposals.

What makes this case unusual is the presence of the endtailing provision in the merger agreement between the local unions. But this fact only highlights the reasons for application of the preemption doctrine here. That the same subject matter is treated one way in the collective bargaining agreement and a different way in the merger agreement highlights the need for a court to avoid potential conflict with the national labor forum. Court involvement here would undermine the unified administration of federal labor policy which Congress plainly intended. As *Lockridge* explained, cases involving alleged interference with a plaintiff employee's existing or prospective employment relations have a "real and immediate" possibility of implicating principles of federal labor law, and therefore are preempted from consideration by the courts. 403 U.S. at 295–96, 91 S.Ct. at 1922–23. This is such a case. It deals with the plaintiffs' loss of seniority at the Star, a matter which has been given over to the Labor Board's primary jurisdiction.[8]

Unquestionably, the activity underlying the plaintiffs' claim fits squarely within the *Garmon* test of being "arguably subject to § 7 or § 8" of the National Labor Relations Act (NLRA). The pressmen and stereotypers agreed to the endtailing provisions in their merger agreement. Section 7 of the NLRA, 29 U.S.C. § 157, grants employees the right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." Arguably, the actions of the pressmen in insisting upon the endtailing provision in the merger agreement are protected by section 7 as "concerted activities" for "mutual aid or protection." Local 6's acceptance of

---

7. *E. g., Steele v. Louisville & Nashville R. R.*, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944) (racial discrimination).

8. *Compare International Ass'n of Machinists v. Gonzales*, 356 U.S. 617, 78 S.Ct. 923, 2 L.Ed.2d 1018 (1958) (state court's jurisdiction upheld for breach-of-contract suit on purely internal union matter).

dovetailing at the bargaining table and the subsequent ratification vote on the entire collective bargaining proposal can arguably be viewed as having restrained or coerced the pressmen in the exercise of those rights under section 7. Since such restraint or coercion, if it exists, is an unfair labor practice, see NLRA § 8(b)(1)(A), 29 U.S.C. § 158(b)(1)(A), the primary jurisdiction of the Labor Board preempts this court from determining whether the plaintiffs have cause to complain about their unions' conduct. Resolving the issue would effectively decide the merits of a labor dispute which can only be resolved by the Labor Board.

## C. Section 301

■ Plaintiffs propose a statutory basis for enforcing their alleged contractual rights in an attempt to avoid the strictures of the Garmon rule. Section 301(a) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185(a), provides federal jurisdiction for "[s]uits for violation of contracts between an employer and a labor organization . . ., or between . . . labor organizations. . . ." [9] Plaintiffs argue that the merger agreement is a contract "between . . . labor organizations," and therefore that this suit is authorized by section 301, notwithstanding the Garmon rule. It cannot be denied that in certain cases, the statutory mandate of section 301 supersedes the court-made doctrine of preemption "because of the evident congressional determination that courts should be free to interpret and enforce collective bargaining agreements . . . ." Lockridge, supra, 403 U.S. at 300, 91 S.Ct. at 1925. This is not such a case.

"The dominant congressional objective behind the enactment of Section 301 of the LMRA appears to have been a relatively simple one, namely, to eliminate certain technical obstacles to suits for breach of collective bargaining agreements." Melt-

zer, The Supreme Court, Congress, and State Jurisdiction over Labor Relations: II, 59 Colum.L.Rev. 269 (1959). Opening federal courts to contract suits between unions appears to have been a decidedly secondary concern. In fact, the "between . . . labor organizations" clause on which the plaintiffs rely, was not included in the LMRA until the House-Senate conference on the legislation. As a result, there is practically no legislative history pertaining to that provision, and the courts have struggled to determine which contracts Congress intended to come within its purview. See, e. g., Parks v. IBEW, 314 F.2d 886, 914–17 (4th Cir. 1963), cert. denied, 372 U.S. 976, 83 S.Ct. 1111; 10 L.Ed.2d 142 (1963).

Some courts have held that those disputes involving "an intra-union problem unrelated to a collective bargaining agreement," Hotel & Restaurant Employees Local 400 v. Svacek, 431 F.2d 705, 706 (9th Cir. 1970), do not come within the scope of section 301. E. g., DiGrazia v. United Bhd. of Carpenters & Joiners, 452 F.Supp. 582 (W.D.Pa. 1978), aff'd mem., 594 F.2d 854 (3rd Cir. 1979) (alleged violation of union constitution). On the other hand, jurisdiction under section 301 has been found to exist where the controversy has a clear impact on labor-management relations. E. g., United Textile Workers v. Textile Workers Union, 258 F.2d 743 (7th Cir. 1958) (no-raiding agreement between unions violated by conduct designed to disrupt bargaining relationship). Cf. Retail Clerks Int'l Ass'n, Local Nos. 128 & 633 v. Lion Dry Goods, Inc., 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503 (1962) (enforcement of strike settlement agreement between employer and local unions).

This court's decision in 1199 DC, Nat'l Union of Hospital & Health Care Employees v. Nat'l Union of Hospital & Health Care Employees, 533 F.2d 1205 (D.C.Cir. 1976), comports with these formulations.

---

**9.** Section 301(a) states in full:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be

brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

That case involved an allegation by members of a local affiliate that the national union had violated the union constitution in merging them into another local affiliate. Cognizant of the limited role of federal courts in adjudicating disputes involving internal union affairs, and there being "no suggestion that employers were forced to make untenable choices concerning union representation," *id.* at 1208, the court affirmed the dismissal of that section 301 allegation as "only an intra-union conflict." *Id.*

Similarly, the instant case is essentially an intra-union conflict. The alleged "contracts" here in question are union constitutions and an agreement which merged two unions into one; the controversy is between a union and some of its members. Plaintiffs allege that their union failed to abide by an agreement with them. This is strictly an internal union affair. The fact that the situs of the alleged union wrongdoing was the bargaining table does not alter the intra-union nature of the alleged misconduct. Likewise, the plaintiffs' contention that the union's acceptance of dovetailing in the Survival Agreement was at odds with a contractual obligation owed to them does not transform the internal union problem into one related to the collective bargaining agreement. The underlying question in the plaintiffs' breach-of-contract claim is whether the union was bound to pursue endtailing at the bargaining table because

of the union constitutions or merger agreement. The answer does not depend upon the Survival Agreement.

Moreover, it is apparent that this case does not have the requisite general effect on labor-management relations. While it affects the seniority of individual employees at the Star, it is not equivalent to the inter-union conflict in *Textile Workers, supra*, 258 F.2d 743, or the employer-union strife in *Retail Clerks, supra*, 369 U.S. 17, 82 S.Ct. 541, 7 L.Ed.2d 503. *Cf. 1199 DC, supra*, 533 F.2d 1205.

For these reasons we hold that section 301 does not provide a jurisdictional basis for the plaintiffs' contractual claim.[10] We emphasize that the extent of our decision with respect to the plaintiffs' breach-of-contract claim against the defendant unions is limited. We have only concluded that they are in the wrong forum to seek redress for the unions' alleged contractual violations. Relief, if any is to be forthcoming, will have to be pursued before the Labor Board.

## III. FAIR REPRESENTATION

Plaintiffs further claim that Local 6 and the International violated the duty of fair representation. Section 9(a) of the NLRA, 29 U.S.C. § 159(a), has been construed to mandate that a bargaining representative deal fairly with the members of the bargaining unit. "The undoubted broad authority of the union as exclusive bargaining

10. Our holding is not inconsistent with Supreme Court decisions in which the preemption doctrine has been declared to be "not relevant" to actions within the purview of section 301. *Local 174, Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 101 n.9, 82 S.Ct. 571, 7 L.Ed.2d 593 (1962); *accord, William E. Arnold Co. v. Carpenters Dist. Council*, 417 U.S. 12, 94 S.Ct. 2069, 40 L.Ed.2d 620 (1974); *Smith v. Evening News Ass'n*, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962); *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962); *Charles Dowd Box Co., Inc. v. Courtney*, 368 U.S. 502, 82 S.Ct. 519, 7 L.Ed.2d 483 (1962). Those cases involved alleged breaches of collective bargaining contracts rather than misconduct at the bargaining table. The Court explained in *Lockridge, supra*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473, that section 301's limitation on the application of

the preemption doctrine does not extend to conduct or agreements beyond collective bargaining agreements:

> The legislative determination that courts are fully competent to resolve labor relations disputes through focusing on the terms of a collective-bargaining agreement cannot be said to sweep within it the same conclusion with regard to the terms of union-employee contracts that are said to be implied in law. That is why the principle of *Smith v. Evening News* [finding concurrent jurisdiction between the Labor Board and federal courts under section 301 where an alleged breach of a collective bargaining contract is also an unfair labor practice] is applicable only to those disputes that are governed by the terms of the collective-bargaining agreement itself.

403 U.S. at 300–01, 91 S.Ct. at 1925.

agent in the negotiation and administration of a collective bargaining contract is accompanied by a responsibility of equal scope, the responsibility and duty of fair representation." *Humphrey v. Moore*, 375 U.S. 335, 342, 84 S.Ct. 363, 368, 11 L.Ed.2d 370 (1964). The exclusive agent's obligation to deal fairly makes it "subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Ford Motor Co. v. Huffman*, 345 U.S. 330, 339, 73 S.Ct. 681, 97 L.Ed. 1048 (1953).

After the Labor Board first held that a union's breach of the duty of fair representation was an unfair labor practice in *Miranda Fuel Co.*, 140 N.L.R.B. 181 (1962), *enforcement denied*, 326 F.2d 172 (2d Cir. 1963), the Supreme Court was confronted with the question of whether the *Garmon* preemption doctrine applied to such claims. *See Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The Court held that *Garmon* does not apply to cases involving alleged breaches of the union's duty of fair representation. *Id.* at 176–88, 87 S.Ct. at 909–915; *accord, Lockridge, supra*, 403 U.S. at 301, 91 S.Ct. at 1925. Among other considerations, the Court cited the unique role played by the judicially-created duty of fair representation doctrine in federal labor law:

> [T]he unique interests served by the duty of fair representation doctrine have a profound effect, in our opinion, on the applicability of the pre-emption rule to this class of cases. . . . [T]he duty of fair representation has stood as a bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law. Were we to hold . . . that the courts are foreclosed by the

NLRB's *Miranda Fuel* decision from this traditional supervisory jurisdiction, the individual employee injured by arbitrary or discriminatory union conduct could no longer be assured of impartial review of his complaint, since the Board's General Counsel has unreviewable discretion to refuse to institute an unfair labor practice complaint. . . . The existence of even a small group of cases in which the Board would be unwilling or unable to remedy a union's breach of duty would frustrate the basic purposes underlying the duty of fair representation doctrine. For these reasons, we cannot assume from the NLRB's tardy assumption of jurisdiction in these cases that Congress, when it enacted N.L.R.A. § 8(b) in 1947, intended to oust the courts of their traditional jurisdiction to curb arbitrary conduct by the individual employee's statutory representative.

*Vaca v. Sipes, supra*, 386 U.S. at 181–83, 87 S.Ct. at 912–913 (citation and footnote omitted). We turn, then, to the merits of the plaintiffs' contention.[11]

Plaintiffs claim that the International violated its duty of fair representation by denying their appeal of the Local's action. However, the International was neither the bargaining representative nor a party to the collective bargaining agreement. Under these circumstances, there is no basis for impaling the International on the horns of the dilemma faced by the Local. *Hughes v. Shoreline Beverage Distributing Co., Inc.*, 85 L.R.R.M. 2071 (S.D. Cal.1973).

As for Local 6, it is difficult to view the undisputed material facts[12] any differ-

---

11. Hypothetically, our resolution of the plaintiffs' claim of unfair representation could conflict with a Labor Board determination of the plaintiffs' contractual claims against the unions since both sets of claims involve basically the same union conduct. Such a conflict could arise only if (1) the plaintiffs pursue their contractual claims before the Labor Board; (2) the claims are deemed timely brought; (3) the Labor Board's General Counsel decides to institute an unfair labor practice complaint; and (4) the Labor Board decides the case in a manner

that is discordant with our own. The risk of conflict in such situations has been determined to be "tolerably slight," *Lockridge, supra*, 403 U.S. at 301, 91 S.Ct. at 1925. Our jurisdiction to consider the plaintiffs' fair representation claim therefore stands clear of the preemption doctrine, even with the described possibility of conflicting results.

12. Plaintiffs' attempts to demonstrate genuine issues of material fact, thereby precluding summary judgment, fall short of the mark. Claims

ently than did the court below. Under the "good faith and honesty of purpose" standard, the focal interest of the Local in trying to save jobs was a legitimate exercise of trade union judgment. Whatever the consequences of that judgment, it is hard to find the breach of even a fiduciary responsibility in the totality of the conduct of Local 6. Indeed, there is persuasiveness to the argument that the duty to save the unit of employment was the more compelling part of the duty to bargain. *Cf. Burchfield v. United Steelworkers*, 577 F.2d 1018 (5th Cir. 1978) (affording equal employment opportunities by altering seniority rights). The union is bound "to represent fairly *all* of its members. To require it to favor one unit over another, without regard to the circumstances of the case, would make satisfaction of that duty impossible." *Ekas v. Carling Nat'l Breweries, supra*, 602 F.2d at 667 (emphasis in original). Here, the merger agreement called upon the union both to preserve the jobs of its members and to keep their seniority rosters intact. Given the Star's insistence on dovetailing in order to keep the newspaper going, the union's

negotiators understandably considered themselves to be in a no-win situation. They determined that the workers' losses would be minimized if the dovetailing proposal were accepted—the loss of work for some being deemed preferable to job losses for all if the Star closed down. Under these circumstances, the union's conduct was eminently reasonable.[13]

We know of no case which has held that an internal union agreement can restrict the union's power to negotiate with respect to seniority in collective bargaining.[14] The plaintiffs seek help from *Laturner v. Burlington Northern, Inc.*, 501 F.2d 593 (9th Cir. 1974), *cert. denied*, 419 U.S. 1109, 95 S.Ct. 783, 42 L.Ed.2d 80 (1975), where a provision in the union constitution set forth the procedures governing merger-related problems, including seniority. The court determined that the constitutional provision "should be broadly construed." *Id.* at 601. It noted that in two previous cases dealing with the consolidation of seniority rights under the provision, the courts' overriding concern was whether the solution was equi-

made in their affidavits that Local 6's president contemplated the dovetailing idea prior to the onset of negotiations for the Survival Agreement are immaterial. The focus here is on what actually took place during collective bargaining with the Star. There is no dispute that the Star offered the dovetailing proposal at the bargaining session on March 31, 1976, and that it was ultimately accepted on April 14, 1976. More than offsetting the plaintiffs' affidavits regarding the origin of the proposal are the affidavits of each member of the union's negotiating team, some of whom opposed dovetailing, that indicate that the Star unilaterally proposed dovetailing, as well as the stipulated recollections of a Star official to the same effect.

In addition, the plaintiffs' allegation of complicity between Local 6 and the Star's negotiators is totally unsupported. To argue that "[t]he opportunity for complicity cannot be doubted," Brief for Appellant at 20, and that "the negotiators had developed over the years a very close working relationship and met together in both a business and social context," *id.*, does not gainsay anything for the plaintiffs. Nor does the union's failure to raise the merger agreement's endtailing requirement in opposition to the dovetailing proposal suggest collusion with the Star in view of the unquestioned precariousness of the Star's financial ability to stay in business.

Finally, the plaintiffs contend that there is undisputed evidence which casts doubt upon the district court's finding that Local 6 agreed to dovetailing in order to save jobs. The evidence does not have that effect. Overall, it demonstrates that cost savings were expected to be achieved from the closing of the stereotype department and dovetailing the stereotypers, lessening the need for lay-offs.

13. The district court aptly noted, "If the Local had refused to bargain with the Star about dovetailing as a solution to its financial problem, the Local's refusal might well have constituted a refusal to bargain in good faith, in violation of § 8[(b)(3)] of the [National Labor Relations] Act." *Baker v. Newspaper & Graphic Communications Union, Local 6, supra*, 461 F.Supp. at 115.

14. *Humphrey v. Moore, supra*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370, has no bearing on this question. There, the Supreme Court found that a joint employer-employee committee acted within the bounds of the collective bargaining agreement provision involved. Thus, the Court was not faced with the issue of whether it would have been a breach of the duty of fair representation if the committee had acted outside of the limitations of that provision.

table, as opposed to whether it was within the strict construction of the constitutional provision. Rather than supporting the plaintiffs' argument that the endtailing provision here should have been strictly followed, the *Laturner* decision cuts the other way, particularly in view of the conflicting provision in the merger agreement calling for the preservation of the membership's jobs. Since the union reasonably believed that it had to transgress one of these provisions, we think that it chose an equitable solution in keeping with the "complete good faith and honesty of purpose" standard of *Ford Motor Co. v. Huffman, supra*, 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048, and the spirit of *Laturner*.[15]

## IV. FREE SPEECH RIGHTS

[8] The plaintiffs' final claim is that Local 6 violated their rights of free speech and political participation, rights secured by section 101(a) of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 411(a),[16] by refusing to permit them to discuss openly the seniority issue, or vote on it separately, at the ratification meeting. The gravamen of their complaint revolves around the alleged statement of the union president that "[w]e are here to accept or reject the contract, not to debate it." In his affidavit, plaintiff Rhoa says that he refrained from general debate because President Dugan indicated that he would not allow any member to discuss dovetailing in particular. The affidavit of James E. Bostic, another pressman, suggests that he was never given an opportunity to participate in the debate.

We think that there is ample support for the district court's grant of summary judgment in favor of Local 6 on this point. Even ignoring the affidavits adduced by Local 6, the plaintiffs' own affidavits reveal that there was considerable discussion of the proposed contract.[17] In particular, plaintiff Schaible's affidavit clearly states that "Brother Bostic . . . presented a detailed analysis of the contract's provisions, stating what he believed to be good and bad in the proposal." Moreover, Schaible acknowledges that the union president expressed his disapproval of the agreement and invited a motion to table the ratification vote. The motion was made and voted down. Ultimately, the contract was approved by a 99 to 44 vote of the membership.

This sequence of events does not suggest an infringement of the plaintiffs' statutory rights. The membership was fully informed on what was in the agreement, they discussed it, and they voted on it. The nature of the vote—a single up-or-down vote on the entire agreement—did not con-

---

**15.** Nothing in the ratification process alters our conclusion that the union did not breach its duty of fair representation. *See* part IV *infra.*

**16.** 29 U.S.C. § 411 provides in part:

(a)(1) Equal rights.—Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organizations, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

(2) Freedom of speech and assembly.—Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinion; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided*, That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

**17.** Plaintiff Baker's affidavit states that "President Dugan opened the special membership meeting held on April 22, 1976 to ratify or reject the 'Survival Agreement' by reading out loud the contents of the 'Survival Agreement.'" According to plaintiff Schaible, "the Scale Committee explained exactly what the union had agreed to and what the company had taken from us." Plaintiff Rhoa's affidavit declares that there was "general discussion of the terms of the contract."

**168**

travene the requirements of section 101(a). As a district court stated on another occasion:

> While package ratification may not represent the most desirable mode of ratification from the point of view of all union members, it neither dilutes the voting power of any individual or group nor discriminates invidiously against any individual or group. Each member has the opportunity to vote to accept or reject a proposed contract according to whatever criteria he or she chooses. Each vote counts the same and has the same effect. A majority of voters can either ratify or reject any Master agreement, and that rejection or ratification falls equally on all members.

*Davey v. Fitzsimmons*, 413 F.Supp. 670, 677 (D.D.C.1976).

What emerges is a picture of a ratification meeting where difficult choices had to be made. In a way that is clearly contemplated by national labor law, those choices were made by the persons voting at the meeting. The plaintiffs have failed to persuade this court that any union misconduct was responsible for their inability to muster a majority of the voting members.

For the foregoing reasons, the judgment of the district court is affirmed except that with respect to the breach-of-contract claim against the unions, it is vacated and the case remanded with instructions to dismiss for lack of jurisdiction.

*It is so ordered.*